*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION:  2001 FED App. 0328P (6th Cir.)
File Name:  01a0328p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re:  JOHN W. BYRD, JR.
            *Movant.*

No. 01-3927

Filed:  September 21, 2001

_____

**IN THE MATTER OF JOHN W. BYRD, JR.**

**NO. 01-3927**

_____

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re: JOHN W. BYRD, JR.,
            *Movant.*



No. 01-3927

Filed:  September 10, 2001

Before:  JONES, SUHRHEINRICH, and BATCHELDER,
            Circuit Judges.

**ORDER DENYING JOHN BYRD'S MOTION TO DETERMINE WHETHER 28 U.S.C. § 2244(b) OF THE AEDPA APPLIES TO HIS CASE, AND GRANTING A TEMPORARY STAY OF EXECUTION UNTIL SEPTEMBER 18, 2001.**

SUHRHEINRICH, Circuit Judge.  Movant John W. Byrd, scheduled to be executed  by the State of Ohio on September 12, 2001 at 10 a.m., seeks a stay of execution while he pursues a second federal habeas petition.[1]  Byrd also

---

[1] Byrd does not characterize his motion as such.  Rather, the motion is styled as "John Byrd's Motion [to] Determine Whether 28 U.S.C. § 2244(b) of the AEDPA Applies to His Case."  As relief, he requests that "this Court [] determine that § 2244 of the AEDPA does not apply to him."  In the alternative he "asks the Court to grant a stay and remand his

points out in her opinion, under the Antiterrorism and Effective Death Penalty Act of 1996, the panel's decision denying Byrd's successive habeas application is not "permitted to be the subject of a petition for rehearing."  No. 01-3927 (CA6, Sept. 10, 2001), p. 26 (citing 28 U. S. C. § 2244(b)(3)(E) (1994 ed., Supp. V).  And even if Byrd could seek en banc review, the Court of Appeals would be able to rule on the petition well before October 8.  Indeed, the Court of Appeals issued the stay on September 10, and by the very next day the court had considered and rejected a judge's request for en banc reconsideration of the stay order.  That leaves the rationale that a panel member needed "additional time to consider the matter."  Of course, however, the panel has already issued its opinion.  Seeing no justification for the stay, I would grant the State's application to vacate the stay.  See *Bowersox v. Williams*, 517 U. S. 345 (1996) (*per curiam*) ("[I]t is 'particularly egregious' to enter a stay absent substantial grounds for relief" (citing *Delo v. Blair*, 509 U. S. 823 (1993) (*per curiam*)).

2001. The trial court and Ohio Court of Appeals dismissed the petition, and the Ohio Supreme Court denied review. *State v. Byrd*, No. 01-1515, Aug. 29, 2001. Byrd then sought permission to file a second federal habeas petition. The Court of Appeals denied Byrd's request on September 10, but stayed the execution until September 18, 2001. On September 11, the Court of Appeals issued an order stating that a member of the court had requested that the en banc court determine whether to vacate the stay issued the day before. The order stated that less than a majority of the court voted in favor of vacating the stay, and "a majority of the active judges have voted to extend the stay of execution until October 8, 2001." No. 01-3927 (CA6, Sept. 11, 2001). The State has filed in this Court an application to vacate the stay granted by the Court of Appeals.

The Court of Appeals has stayed the execution of John Byrd without any explanation of a constitutional defect that would warrant the issuance of a stay by a federal court. The only opinion it has written convincingly concludes that there is no basis for a stay. The only reason the Court of Appeals has provided for granting the stay is to give "a panel member . . . additional time to consider the matter." In extending the stay until October 8, 2001, the court provided no additional justification. Byrd surmises that the Court of Appeals extended the stay to October 8 "in order to consider John Byrd's Petition for Rehearing En Banc." Response to State's Application Seeking Lifting of Stay 4. But the Court of Appeals' order does not offer this as a reason for granting the stay; the order only adds that "the clerk of the court is directed to file and submit to the court any petition offered by a party seeking en banc review of the decision of the panel." In any event, en banc consideration would not warrant granting a stay until October 8. As Judge Batchelder

asks this Court to determine that 28 U.S.C. § 2244(b), the Anti-Terrorism and Effective Death Penalty Act, "AEDPA," which bars second or successive petitions unless they are based on facts which could not have been discovered previously through the exercise of due diligence, does not apply to him. For the following reasons, Byrd's motion for stay of execution is **DENIED,** but the execution will be stayed until September 18, 2001, upon the request of a panel member for additional time to consider the matter. Byrd's request to file a second habeas petition is also **DENIED** as barred under § 2244(b) of the AEDPA.

## I.

Byrd was convicted by a jury and sentenced in 1983. He was originally scheduled to be executed on January 27, 1984. Byrd's convictions and sentences were upheld on direct appeal to the Ohio Court of Appeals, *see State v. Byrd*, No. C-830676, B-831662 (Ohio Ct. App. Feb. 5 1986), on direct appeal to the Ohio Supreme Court, *see State v. Byrd*, 512 N.E.2d 611 (Ohio 1987), and the Supreme Court denied certiorari. *See Byrd v. Ohio*, 484 U.S.1037 (1988). Byrd also filed a motion for a new trial in December 1983, which the trial court denied in September 1989. The Ohio Court of Appeals upheld the trial court, *see State v. Byrd*, No. C-890659 (Ohio Ct. App. Feb. 13, 1991), and the Ohio Supreme Court subsequently declined jurisdiction. *See State v. Byrd*, 574 N.E.2d 1092 (Ohio 1991).

In 1988 Byrd filed his first petition for state postconviction relief, which the trial court denied. The Ohio Court of Appeals reversed in 1991 and remanded the case for further

---

case to the district court for an evidentiary hearing into whether his evidence meets *Schlup's* actual innocence gateway standard for filing a second petition." He also states that "[i]f the Court determines that § 2244(b) does not apply to Byrd's case, he will immediately file in the district court the second habeas petition he tendered to this motion." However cast, Byrd is seeking the permission required by 28 U.S.C. § 2244(b)(3)(A) to file as second habeas petition.

Cite as: 533 U.S. \_\_\_\_ (2001)

Dissent from denial of application to vacate

## SUPREME COURT OF THE UNITED STATES

---

No. 01A286

---

MARGARET BAGLEY, WARDEN *v.* JOHN W. BYRD, JR.

ON APPLICATION TO VACATE STAY

[September 12, 2001]

The application to vacate the stay of execution of sentence of death entered by the United States Court of Appeals for the Sixth Circuit presented to JUSTICE STEVENS and by him referred to the Court is denied.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

John W. Byrd, Jr., was scheduled to be executed by the State of Ohio today, September 12, at 10 a.m. (edt). Byrd was convicted and sentenced to death in 1988 for the murder of Monte Tewksbury. Byrd's conviction and sentence was upheld on direct appeal, and we denied certiorari. *Byrd v. Ohio*, 484 U. S. 1037 (1988). In 1988, Byrd filed a petition for state postconviction relief. The Ohio courts denied the petition. In 1994, Byrd filed a petition for writ of habeas corpus in federal court. The district Court and Court of Appeals for the Sixth Circuit dismissed the petition, and we again denied certiorari. *Byrd v. Collins*, 531 U. S. 1082 (2001). Byrd filed another petition for state postconviction relief on April 9,

proceedings. On remand the trial court again entered summary judgment for the state, and Byrd appealed. The Ohio Court of Appeals affirmed, *see State v. Byrd*, No C-910340 (Ohio Ct. App. Feb. 26, 1992), and the Ohio Supreme Court declined jurisdiction. *See State v. Byrd*, 596 N.E.2d 472 (Ohio 1992).

Byrd filed his initial petition for writ of habeas corpus under 28 U.S.C. § 2254(d) on March 7, 1994. The district court denied an evidentiary hearing and habeas relief in 1995. *Byrd v. Collins*, No. C-1-94-167, slip. op. (S.D. Ohio July 28, 1995); *Byrd v. Collins*, No. C-1-94-167, slip. op. Nov. 2, 1995). Last year, over dissent, this Court affirmed the judgment of the district court. *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000).[2] A divided court denied Byrd's petition for rehearing *en banc*. *Byrd v. Collins*, No. 96-3202, *amended en banc order* (6th Cir. Aug. 22, 2000). The United States Supreme Court denied Byrd's petition for writ of certiorari on January 8, 2001. *Byrd v. Collins*, 531 U.S. 1082 (2001). The district court subsequently issued a mandate dismissing Byrd's habeas petition on January 25, 2001.

On January 26, 2001, Byrd filed a motion in the Ohio Supreme Court seeking a stay of execution to permit him to litigate the issue of his actual innocence of the death penalty. On March 20, 2001, the Ohio Supreme Court issued an entry permitting Byrd to file a second state post-conviction petition in the trial court and remanding the case for a hearing on the claim that he was actually innocent of the death penalty. The Ohio Supreme Court's entry set Byrd's execution date for September 12, 2001. *State v. Byrd*, 744 N.E.2d 190 (2001).

Byrd filed a petition for post-conviction relief in the Hamilton County, Ohio, trial court on April 9, 2001. In it he raised, *inter alia,* the claim that he was actually innocent of the death penalty. Byrd based his first claim on the 1989 affidavit of co-defendant John Brewer, in which Brewer

---

[2]For a thorough review of the underlying events, *see Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001).

---

**DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, dissenting from the order extending the stay of execution, in which SILER, Circuit Judge, joins.

The order granting the stay of execution until October 8, 2001, states "A majority of the active judges have voted to extend the stay of execution . . ." It does not say that the request for this stay was referred to all of the active judges of the court. In fact, no such request was referred to me at any time. Rather, the request—which apparently came not from the petitioner but from Judge Jones—was referred only to those members of the court who could be counted upon to vote in favor of the stay.

As best I am able to determine, one judge of this court orally ordered this stay to be entered, stating that it represented the votes of a majority of the court. There was never any written request for a stay. There was no written vote. In short, there is no record of the cabal that resulted in this stay.

There is no room for argument about whether all of the judges in active service are members of the en banc court. They are. *See* 28 U.S.C. § 46(c). In this circuit, however, only some of those judges are permitted to have notice of requests made to the en banc court and to vote on those requests.

I write in dissent from this purported order because I was given no opportunity to vote on the request for the stay, and I will not be party to either the procedure that produced it or the precedent that some of the members of this court are attempting to set.

alleges that he, not Byrd, actually murdered Monte Tewksbury. In his second claim Byrd alleged that the trial testimony of state's witness Ronald Armstead and the grand jury testimony of state witness Virgil Jordan were not credible. He also requested discovery of records from the prosecutor's office and the state department of corrections. The trial court denied Byrd's discovery requests and dismissed Byrd's post-conviction petition without an evidentiary hearing on May 25, 2001. *State Byrd*, No. B-831662(A) (Hamilton C.P. May 25, 2001). Regarding the Brewer affidavit, the court held:

> Byrd and his attorneys agree that they received Brewer's 1989 affidavit in 1989. For tactical reasons, they did not file the affidavit or make it known to this or any court at that time even though Byrd had a motion for a new trial pending at that time. Byrd, in 1989, was pursuing an appeal and a motion for new trial contending in part that Byrd was not even at the scene of the crime on the night in question. Brewer's affidavit puts Byrd squarely at the crime scene.

> As a consequence of this tactical decision by Byrd and his attorneys, Byrd is now barred, under Criminal Rule 33, from filing a motion for a new trial because, as his attorney conceded in oral argument, the 1989 affidavit is not newly discovered evidence.

> Byrd and his attorneys now insist that the 1989 affidavit is true. Thus, Byrd concedes that the position he pursued in court for so long, that he was not at the crime scene, is untrue. Byrd now concedes that he was there but that Brewer, not Byrd, stabbed the victim.

> The affidavit of Brewer in 1989 lacks any credibility whatsoever. The 1989 affidavit is inconsistent with his 2001 affidavit to say nothing of his sworn testimony at his trial. As the State accurately points out, Brewer continued to make statements identifying Byrd as the principal offender well into his period of incarceration to a variety of people. The Brewer affidavit lacks any

credibility for a variety of reasons including those cited by the State during oral argument. The affidavits fail to meet the standard set forth in *Herrara v. Collins*, 506 U.S. 390 (1993).

The trial court ruled that the claim of actual innocence based on Armstead's lack of credibility was barred by res judicata.

The Ohio Court of Appeals affirmed the trial court's judgment on August 21, 2001. *State v. Byrd*, No. C-010379, 2001 WL 950185 (Hamilton Ct. App. Aug, 21, 2001) (per curiam). The appeals court stated in relevant part:

In his first claim for relief, Byrd contended that he was "actually innocent" of aggravated murder because his co-defendant John Brewer killed Tewksbury. Byrd cited to portions of the trial transcript and material adduced at his trial to demonstrate that Brewer was the killer. Byrd additionally presented two affidavits signed by Brewer on May 16, 1989, and January 24, 2001, respectively, in which Brewer claimed that he, and not Byrd, fatally stabbed Tewksbury. Byrd also presented the affidavit of Dan Cahill, a fellow inmate of Brewer at the Southern Ohio Correctional Facility, who claimed that Brewer had told him that he murdered Tewksbury.

. . .

In this case, the trial court dismissed Byrd's claim of "actual innocence" for two reasons: first, because it did not give rise to a constitutional violation in the proceedings that resulted in his conviction; and second, because the evidentiary basis for the claim– John Brewer's statement that he had actually killed Tewksbury--"lacked any credibility whatsoever." We agree. . . . With respect to the second reason, we note, under *Herrara*, *supra*, that the evidentiary threshold for a claim of actual innocence is "extraordinarily high." On the state of the record in this case, the trial court was entitled to conclude that the evidence provided by Byrd in the affidavits fell "far short" of that which would have

It may be that Byrd's attorney should be censured, but in the end, this attorney has "had his way" with this Court.

As I understand the facts, a few select active judges were called by telephone for their vote and other active judges were not. In fact, as of this date, there is not any formal written confirmation or identification of who voted. There was no discussion as to the views and opinions of the minority of the Court members. This Court should be governed by the Rule of Law, and proper procedures are part of that concept. I write this dissent in the hope that something like this never happens again, in this Court or in any other court.

---

**DISSENT**

---

SUHRHEINRICH, Circuit Judge, dissenting from the refusal to vacate the panel's stay and dissenting from the order extending the stay.

I write in dissent of the so-called en banc court's decision to grant a thirty-day stay of execution. I do not quarrel that any federal judge could grant a stay. *See* 28 U.S.C. § 2251. My problem is with the "procedure" used in this case.

A thirty-day stay was granted without anyone from the Court asking me, a member of the panel, for my opinion, let alone my vote. This vote was not an en banc procedure but was done in secrecy by some of the active members of the Court. The vote was taken orally by telephone and not by written response to a petition as is the custom of this Court. There was no motion or formal request for me to reply to. If any of the Judges voting had bothered to read my opinion, they would know that there is a serious question as to whether this decision can even be reviewed by an en banc court. They also would know that Byrd's attorneys had this affidavit since *1989*. Byrd was under an order by this Court in 1994 to raise and divulge any claim he might have. After oral argument and before the decision was made on the first habeas petition, Byrd had eighteen months to ask for leave to amend his petition. Byrd's attorney reported to a newspaper that he was holding back on the so-called "actual innocence" affidavit. Yet Byrd waited almost one year after our decision was filed, and, at the eleventh hour, filed this second habeas petition.[1]

---

[1] I should add that Byrd engaged in the same deceitful behavior in state court. As the state trial court judge noted on May 25, 2001, Byrd withheld the 1989 affidavit "even though Byrd had a motion for a new trial pending at that time." *State v. Byrd*, No. B-831662(A) (Hamilton C.P. May 25, 2001).

---

been necessary to make out a cognizable constitutional claim.

– N.E.2d at – , 2001 WL 950185, at * 5-7 (footnote omitted). The Ohio Court of Appeals also agreed with the trial court's conclusion that Byrd's second claim challenging Armstead's credibility was barred by res judicata because it had been raised at his trial, on appeal, in his first postconviction petition, and in federal habeas corpus proceedings.

On August 29, 2001, the Ohio Supreme Court declined jurisdiction and dismissed the appeal "as not involving any substantial constitutional question." *State v. Byrd*, Case No. 01-1515 (August 29, 2001).

**II.**

Under the AEDPA, a petitioner is required, prior to filing a second or successive habeas corpus petition in the district court, to seek authorization "in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A).[3]   Under the

---

[3] Under 28 U.S.C. § 2244(b)(3)(C), "[t]he court of appeals may authorize the filing of a second or successive application only if it determines that the application makes prima facie showing that the application satisfies the requirements of this subsection." Furthermore, "[t]he grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3)(E). *See also In re King*, 190 F.3d 479 (6th Cir. 1999) (en banc) (holding that denial of permission to file a second or successive habeas petition under AEDPA is not subject to en banc review). Although Byrd's initial federal habeas petition predated the effective date of the AEDPA, this attempt at filing a second habeas petition is clearly governed by the AEDPA. *Cf. Slack v. McDaniel*, 529 U.S. 473 (2000) (holding that an appeal from the dismissal of a habeas corpus petition after the effective date of the AEDPA is governed by AEDPA, regardless of whether the habeas petition was filed in the district court before or after AEDPA's effective date). *See also Steward v. Martinez-Villareal*, 523 U.S. 637, 643 (1998) (noting that had the prisoner's current request for relief been a second application, it "plainly should have been dismissed" under § 2244(b) of the AEDPA, even

AEDPA, a second or successive habeas corpus application under § 2254 that was not presented in a prior application "shall be dismissed unless" the applicant shows "the factual predicate" for his new claim of innocence "could not have been discovered previously through the exercise of due diligence," or that the claim "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2244(2)(A) & (B).[4]

Byrd does not rely on a new rule of constitutional law and he openly admits that he cannot establish that the factual predicate for his new claim is newly discovered. *See* Byrd's Memorandum in Support at 17 ("John Byrd has not claimed and could not claim that he has *newly discovered* evidence of actual innocence of the death penalty as defined in § 2244(b) of AEDPA.") (Emphasis in original.) This is the case because Byrd deliberately chose not to use his proof of actual innocence – Brewer's statements – in support of his initial state post-conviction petition, and he likewise chose not to cite Brewer's affidavit in his first federal habeas petition. Thus, as Byrd concedes, he cannot satisfy § 2244(b)'s requirements.

Instead, he argues that under pre-AEDPA "abuse of the writ" decisions, habeas petitioners were allowed to file second or successive petitions raising claims that were or could have been raised earlier when the petitioner met the "actual innocence/fundamental miscarriage of justice" exception, as defined by the Supreme Court in *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991), and *Schlup v. Delo*, 513 U.S. 298 (1995). Byrd asserts that the pre-AEDPA "abuse of the writ" standard, rather than § 2244(b), should apply to his case because his initial habeas petition was filed prior to the

though his initial federal habeas petition was filed in 1993, prior to the enactment of the AEDPA).

[4] Section 2244(b)(2) contains a third basis for permitting a second or successive petition, that is not relevant in this case.

_____

**DISSENT**

_____

BOGGS, Circuit Judge, dissenting from Order extending the Stay of Execution to October 8, 2001.

On the afternoon of Monday, September 10, this court issued an order containing the language "but the execution will be stayed until September 18, 2001, upon the request of a panel member . . . ." Late that day, I made a request for an en banc vote, and a voting ballot was sent out by the Clerk that evening asking for votes to "determine whether to vacate the 8-day stay of execution entered in this case." It would, of course, have been absurd for such a ballot to be sent out if no stay were in effect.

A candid reader may compare the above undisputed facts with the statements in the addenda to Judge Jones's concurrence, which he filed on September 19.

The addenda also contains the statement "that a majority of the active judges (confirmed by the Clerk) had expressed a desire to join in the thirty day stay . . . ." No information has come to my attention to suggest that the Clerk so confirmed the position of a majority of the active judges.

the stay" that each of those majority members acted subsequent to the request for a vote on vacating the stay. I am reliably informed that one or more judges whose approval was represented for the longer stay gave such approval before there had been either any action by the panel or the request for a vote on vacating the stay.

Finally, my information is that the "Clerk of Courts" had received NO communication from individual active members of the court as to the longer stay. What "individual communication with the Chief Judge" may have occurred is a matter which the Chief Judge has yet to communicate to me, the court generally, or to the Clerk.

This type of secret undocumented decision-making by exclusive in-groups is the way decisions are made in totalitarian countries, not usually in the United States. It is necessary, though highly painful, for me to place on the public record the way in which this purported order was issued, and to dissent from that process, far beyond my dissent from the underlying and fundamental lack of legal support for the order.

---

effective date of the AEDPA, and the application of the AEDPA standards would have an "impermissibly retroactive effect." He cites our decisions in *In re Hanserd*, 123 F.3d 922 (6th Cir. 1997) and *In re Sonshine*, 132 F.3d 1133 (6th Cir. 1997) in support of his argument.

Our initial inquiry is whether provisions of the AEDPA apply to this case. *See In re Green*, 144 F.3d 384, 385 (6th Cir. 1998) (per curiam).[5]

> When a case implicates a federal statute enacted after the events in suit, and Congress has not expressly prescribed the statute's proper reach, the court must determine whether the new statute would have a retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280-81 . . . (1994).

*Id.* at 386. In *Hanserd*, we determined that Congress has not expressed any clear intent as to the statute's proper reach. *See Hanserd*, 123 F.3d at 924. We must therefore determine whether the provisions of the AEDPA apply to this case, resorting to *Landgraf's* default rules to decide whether AEDPA may be applied here. *See id.*

In *Hanserd*, the petitioner, who pleaded guilty to using a firearm in a drug trafficking offense, in violation of 18 U.S.C. § 924(c), filed his initial § 2255 in 1995, arguing that his drug conviction violated the Double Jeopardy Clause. The district court denied the motion in July 1995, and we affirmed on appeal. *See Hanserd v. United States*, 89 F.3d 833, 1996 WL 316491 (6th Cir. June 10, 1996). While that appeal was pending, the Supreme Court announced its decision in *Bailey v. United States*, 516 U.S. 137 (1995), on December 6, 1995.

---

[5]Byrd likewise acknowledges that this question must be decided by this Court, and not the district court. *See Hanserd*, 123 F.3d at 934; *Sonshine*, 132 F.3d at 1134.

*Bailey* held that the lower courts, including our own, had been sustaining convictions under § 924(c) for innocent behavior. On November 6, 1996, after the effective date of the AEDPA, Hanserd filed a motion with this court seeking leave to file a second or successive petition in the district court based upon the intervening *Bailey* decision. Specifically, Hanserd claimed that under *Bailey* he was serving time for conduct that was never a crime. *Hanserd*, 144 F.3d at 924.

Thus, the issue presented in *Hanserd* was "whether AEDPA's new restriction on filing multiple § 2255 motions 'is the type of provision that should govern cases arising before its enactment.'" *Id.* (quoting *Landgraf*, 511 U.S. at 280). Noting that Congress had not expressed any clear answer to the question, the *Hanserd* court looked to *Landgraf's* default rules to decide the issue. *Id.* This involved first determining whether the new legislation makes any changes to the controlling law, and second, whether, in light of any change, applying the relevant new law would attach new legal consequences to conduct predating the Act's passage such that applying it would have an impermissible retroactive effect. *Id.* at 924-25 (citing *Landgraf*).

The *Hanserd* court noted that under pre-AEDPA jurisprudence, a federal prisoner who wished to file a second or subsequent § 2255 motion was required to prove in the district court either that the motion did not constitute "abuse of the writ" or that he had made a "colorable showing of factual innocence," as required by *McCleskey. Id.* at 928. The court determined that Hanserd satisfied both of these criteria, because he could show both "cause" and "prejudice" for failing to raise the *Bailey* issue in the first motion. The court found that Hanserd had demonstrated cause for his failure to raise the issue in his first motion because at the time, this Court had supported a broad definition of "use" under the statute and had specifically rejected the claim in his direct appeal. *Id.* at 929. Hanserd also made a sufficient showing of both prejudice and actual innocence, because "it appear[ed] from the record that he pleaded guilty and was convicted for conduct that is, under *Bailey*, not criminal." *Id.*

1) Deny the motion to vacate the stay, on which the time for voting had not expired, and on which no majority of negative votes had been received. [This was procedurally virtually criminal, as the only notice to the court indicated that each judge would have until 2 P.M. to vote (and, by practice, to change his or her vote, within the stated time)];

2) Enter an order extending the stay for 30 days, based on an alleged agreement from unnamed judges to a proposition without stated procedural basis, which had never, before or after, been reduced to writing, nor had or have its supporters yet been identified nor reduced to writing, nor had the proposition or its support been made available to many (perhaps all) members of the court; and

3) Enter an order directing prospectively the filing and circulating of an as-yet unreceived document purporting to be an en banc petition, in a circumstance where it is extremely dubious that such a petition is permissible. In fact, unanimous direct precedent of this court *en banc*, (see *In re King*, 190 F.3d 479 (6th Cir. 1999) (en banc)), and statutory authority, are specific that the petition would be an impermissible attempt to obtain en banc consideration of a matter that is not within the jurisdiction of the en banc court.

Again, this order was to be entered on the word of an Article III judge, purporting to speak for the Chief Judge, with the support of unnamed judges, whose support has never yet been memorialized in writing, upon a proposition never put before the other members of the court or reduced to writing.

Members of the court may indeed act in an informal manner in recording their opinions upon stated matters, in situations of extreme time pressure. There was no such pressure, and there was no stated matter. It is simply a lie to say that "the exigencies of the circumstances required the prompt entry of the Order to preserve the status quo." The status quo was preserved until September 18. It is also inaccurate to infer from the words "[i]nstead . . . a majority favored extending

The *Hanserd* court therefore concluded that "under the old abuse-of-the-writ standard Hanserd would be entitled to raise his *Bailey* claim in a § 2255 motion." *Id.*

Next, the *Hanserd* court determined that the AEDPA standard would not allow such a § 2255 motion. The court noted that under the new law, a prisoner may file a second § 2255 motion only if the court of appeals rules that the motion contains newly discovered evidence or is based on a new rule of constitutional law. The *Hanserd* court observed that in the case *sub judice* there was no newly discovered evidence, and that *Bailey* merely decided the proper meaning of "use" under § 924(c) and did not announce a new rule of constitutional law. *Id.* at 929. Under the AEDPA standard, Hanserd's request to file the § 2255 motion would be denied. *Id.* Thus, applying the new statute would attach a severe new legal consequence to his filing a first motion; Hanserd would have lost the right to challenge his sentence. *Id.* at 931. The *Hanserd* court therefore held that Hanserd did not need permission to file a second motion to challenge his § 924(c) convictions under 28 U.S.C. § 2255 in the district court.

Relying on *Hanserd*, the movant in *Sonshine* argued that he should be allowed to file a second motion to vacate to raise ineffective assistance of trial and appellate counsel due to their failure to advise Sonshine or the district court that the court was required to impose his sentences on two counts concurrently with his undischarged prison term. Sonshine relied upon the following passage in *Hanserd*: "We therefore hold that a federal prisoner must satisfy the new requirements of 28 U.S.C. § 2255 only if he has filed a previous § 2255 motion on or after April 24, 1996, the date AEDPA was signed into law. As Hanserd's previous § 2255 motion was filed before that date, he does not need to meet this new standard to file a second motion." *See Sonshine*, 132 F.3d at 1134 (quoting *Hanserd*, 123 F.3d at 934). Sonshine claimed that this language in *Hanserd* meant that he did not need to meet the new gatekeeping requirements of AEDPA because, like Hanserd, his first § 2255 motion was filed before April 24, 1996. He therefore reasoned that he does not need

## DISSENT

BOGGS, Circuit Judge, dissenting, in which SUHRHEINRICH and BATCHELDER, JJ., join. I add to my previous dissent, because any false impressions that a reader might take from other opinions on the public record should not stand uncorrected.

A voting ballot was issued to the nine active members of the court on Monday on my request to vacate the stay originally granted by the panel. That ballot said that votes could be cast at any time up until 2 P.M., Tuesday, September 11. At that point Byrd's execution was firmly stayed until September 18.

So far, so good, at least procedurally.

Monday night,[1] with the time for voting not having run, with only one formal vote (no) having been received in the Clerk's office (and 2 additional no notes and 3 yes votes still to be received Tuesday morning), the Clerk was informed verbally, by an Article III Judge, purporting to speak for the Chief Judge, that he should enter an order *immediately* the next morning, without any prior notice to the rest of the court, that would:

---

[1] I emphasize in the strongest terms that the issuance of the court's order had NOTHING to do with the tragic events of Tuesday morning. The order to file the opinion had been given Monday night. Whatever judges supported that order at that time could not have, in the words of Judge Jones, "felt, in this emergency situation, a reasonable extension to October 8th was in order." Nor could they have believed, in his words, that "Petitioner faced death within thirty-six hours" since a stay was in place for more than a week from that time.

this court's authorization to file a second § 2255 motion at this time.

The *Sonshine* court rejected this reading of *Hanserd*:

Taken out of context in this way, the quoted portion of the *Hanserd* decision would seem at first glance to support Sonshine's position. *See also Hanserd*, 123 F.3d at 933 ("Our holding means that federal inmates will have one post-AEDPA bite at the apple, limited further, for prisoners who filed a § 2255 motion before AEDPA's enactment, by the old abuse-of-the-writ standard."). Sonshine is now requesting his "one-post AEDPA bite at the apple." However, when read in the context of the entire decision, it is clear that his case is not supported by *Hanserd*.

The specific problem we addressed in *Hanserd* was whether a legitimate claim brought pursuant to *Bailey v. United States*, 516 U.S. 137, . . . (1995), could be brought before the federal courts when the movant had already presented a pre-AEDPA, pre-*Bailey* motion to vacate under § 2255, and would thus be barred from bringing another § 2255 motion by the gatekeeping requirements set up by Congress in AEDPA. While *Bailey* itself was merely a decision of statutory interpretation--making it ineligible to support a second § 2255 motion under AEDPA--it raised concerns of constitutional dimension as numerous inmates were serving mandatory prison time for offense of which they were actually innocent. *See Triestman v. United States*, 124 F.3d 371-72, 379 (2d Cir. 1997); *Hanserd*, 123 F.3d at 929.

We, therefore, analyzed the effect that AEDPA had on a claim, such as that raised by Hanserd, which would have survived the old "abuse-of-the-writ" test, *see McCleskey v. Zant*, 499 U.S. 467, 494-95, . . . (1991), under the Supreme Court's decision in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 . . . . We concluded that AEDPA does not apply to a movant seeking to raise a *Bailey* claim after having filed a pre-AEDPA motion to

Under these circumstances:

either the Supreme Court must reverse, at a minimum, the *extended* stay;

this court must adopt new court rules explicitly allowing this type of currently lawless action; or

we must recognize and confess that a majority of the court simply feels that it is not bound by law when it comes to some death-sentenced prisoners.

However, I cannot understand how a panel can render a decision on the merits, which affirmatively finds that the prisoner's claims have no merit, and then issue a stay to allow one member of the panel "additional time to consider the matter." We are not a "super-court" that supervises all executions in the states within our jurisdiction. Our jurisdiction is limited by Constitution and statute. The panel has determined all matters that come within that jurisdiction.

This court's power to issue a stay was therefore dubious at best (a fact that the panel apparently later recognized, since it removed all reference to the stay from its amended decision. *Compare* September 10, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case, and Granting a Temporary Stay of Execution until September 18, 2001, *with* September 11, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case). Then, however, the situation was exacerbated when the clerk of this court issued a much longer stay, apparently based on the word of one Article III judge that a majority of the active members of the court had approved it. This act was taken in response to no apparent motion, it had no jurisdictional basis, and it was done *without providing any notice to some members of the court*.

What we hold, apparently, is that death-sentenced prisoners need not resort to creative legal tactics to come within this court's jurisdiction. So prisoners may file anything, regardless of statute or prior law, and the en banc court may stay their execution for any length of time it chooses. For example, they could file a hot dog menu, and the en banc court might use that as a legal basis to stay their execution.

The truth may be that for *this* prisoner, a majority of the active members of *this* court would grant a stay based on a hot dog menu. This, however, is not a correct statement of the law (nor is it of any sort of law at all).

vacate because applying AEDPA would have a retroactive effect on the movant's pre-AEDPA conduct, i.e., he would be barred from filing a second motion to vacate under AEDPA whereas, before the Act, he would have been permitted to file his second motion.

> *Because the Hanserd court's Landgraf analysis was based upon the retroactive effect that AEDPA had on the movant's particular claim, the Hanserd holding must be similarly circumscribed. Consequently, while Hanserd is not strictly limited to claims arising under Bailey, apart from that class of claims, there will be few other cases "in which the difference matters," Hanserd, 123 F.3d at 934 n.21, and on which the gatekeeping requirements of AEDPA will thus have an impermissibly retroactive effect.*

*Id.* at 1134-35 (emphasis added). The *Sonshine* court concluded Sonshine was not entitled to relief, because the issue he sought to raise was basically one arising under the Sentencing Guidelines, which would be barred under both AEDPA and the abuse-of-the-writ standard. *Id.* The court further noted that Sonshine would not have prevailed under the pre-AEDPA law, because his petition would have been denied as an abuse of the writ. *Id.* Thus, the AEDPA's new restrictions did not attach new legal consequences for Sonshine, and the AEDPA had no "impermissibly retroactive effect" on the case. *Id.*

Thus, in *Sonshine*, this Court carefully limited *Hanserd*. The *Sonshine* court stated that the retroactivity determination in *Hanserd* was based on the particular facts presented, and while *Hanserd* is not strictly limited to claims arising under *Bailey*, "apart from that class of claims," few cases will qualify as those "in which the difference matters" and the AEDPA will have an impermissibly retroactive effect.

In *Green*, we refused to apply *Hanserd* where it was clear from the record that the prisoner could not have justified a second action under the pre-AEDPA cause and prejudice standard. The movant in *Green* had been convicted of being

a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Green filed his first motion to vacate under § 2255 on June 25, 1992, which was subsequently denied as without merit. He filed a second § 2255 motion on August 3, 1995, which the district court denied as an abuse of the writ. In his third motion, Green argued that there had been a substantive change in the law based on *Old Chief v. United States*, 519 U.S. 172 (1997). *Old Chief* held that a district court abused its discretion for admitting evidence of a prior conviction for the sole purpose of supporting a 18 U.S.C. § 922(g) conviction, after the defendant offered to stipulate to the existence of the prior conviction. *See Green*, 144 F.3d at 385. The *Green* court held that the decision in *Old Chief* announced a "new rule" of criminal procedure, and was subject to the rule of *Teague v. Lane*, 489 U.S. 288 (1989) (holding that if a decision announces a "new rule" of criminal procedure, it is not to be applied retroactively to convictions that have already become final when the decision is announced, subject to certain exceptions). As such, it was not retroactive and was therefore inapplicable on collateral review. *Id.*

More importantly, the *Green* court held that regardless of whether *Old Chief* announced a new rule, the gatekeeping provisions of § 2244 applied to Green's case because Green would not have been able to establish cause to excuse his failure to assert this claim in his first pre-AEDPA § 2255 motion to vacate. The court reasoned: "If *Old Chief* was dictated by precedent, then his claim would not have been considered 'novel,' so as to establish cause his failure to assert this claim in his first motion to vacate." *Id.* at 387. The *Green* court concluded:

> Thus, even if *Old Chief* did not announce a new rule, applying AEDPA to this case would not have a retroactive effect on pre-AEDPA conduct. Green would have been barred from asserting this claim in a pre-AEDPA motion to vacate under the abuse of the writ doctrine, as he would not have been able to establish cause to excuse his failure to present this claim in his

---

**DISSENT**

---

BOGGS, Circuit Judge, dissenting from the refusal to vacate the panel's stay and dissenting from the order extending the stay.

The panel's order of September 11, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case, addresses Byrd's self-titled "Motion [to] Determine Whether 28 U.S.C. § 2244(b) of the AEDPA applies to His Case." However, procedurally Byrd's motion can only be one thing if it is to be properly before this court: an application pursuant to 28 U.S.C. § 2244(b)(3)(A), seeking permission of the court of appeals to file a second habeas petition. The panel dealt with Byrd's motion as such, *see id. at n.1*, and rendered a decision on the merits, first holding that § 2244(b) does apply to Byrd and then denying his request to file a second habeas petition. An order such as this, denying permission to file a second habeas petition, is not reviewable en banc. *See In re King*, 190 F.3d 479, 480-81 (6th Cir. 1999).

Alternatively, the panel may have found Byrd exempt from AEDPA. However, in that case, this court would have no jurisdiction over his petition, as a habeas petition must be filed first in district court. Had Byrd gone to district court, it is conceivable that action by the district court could be reviewed on appeal or en banc. However, our court cannot take jurisdiction over a non-AEDPA habeas petition in the first instance.

I can understand how a panel, faced with a last-minute motion, and out of an abundance of caution, could stay an execution while it is considering the motion. I can understand why a member of the panel, for tactical or other reasons, could request that the panel defer a ruling and issue a stay.

This case has stirred a disturbing degree of acrimony within the court which reflects the politicization of the issues by some public officials with motives open to serious question. It creates a climate that Judge Cranch warned about in one of the most eloquent dissents ever written nearly two hundred years ago:

In times like these, when the public mind is agitated. . . . .it is the duty of a court to be peculiarly watchful lest the public feeling should reach the seat of justice, and thereby precedents be established which may become the ready tools of faction in times more disastrous. The worst of precedents may be established from the best of motives. We ought to be on our guard lest our zeal for public interest lead us to overstep the bounds of the law and the Constitution: for although we may bring one criminal to punishment, we may furnish the means by which an hundred innocent persons may suffer.

The Constitution was made for times of commotion. In the calm of peace and prosperity there is seldom great injustice. Dangerous precedents occur in dangerous times. It then becomes the duty of the judiciary calmly to poise the scales of justice, unmoved by the arm of power, undisturbed by the clamor of the multitude.

As this court proceeds to examine the issues presented by the parties to this dispute, my hope is that we pay heed to the wise advice of Judge Cranch to "calmly poise the scales of justice." We all should be prepared to live with the ultimate result.

first motion to vacate, nor could he have otherwise made a colorable showing of factual innocence. *See McCleskey v. Zant*, 499 U.S. 467, 495 . . . (1991); *In re Hanserd*, 23 F.3d at 928-29.

*Id.* at 387-88. The gatekeeping provisions in § 2244 therefore applied to Green's case. *Id.* at 388.

The *Hanserd* exception, as clarified by *Sonshine* and *Green*, does not apply here. *Sonshine* makes clear that the AEDPA gatekeeping provisions of § 2244(b)(2) cannot be avoided simply because the initial habeas petition was filed pre-AEDPA. Furthermore, it is apparent from *Hanserd*, *Sonshine*, and *Green* that the exception applies where the petitioner was *unable because of the then-current state of the law* to raise a claim in his first federal petition. In *Hanserd*, the movant's request was based on an intervening Supreme Court decision that gave the movant an argument that he could not have previously raised in his initial habeas petition. Thus, the movant in *Hanserd* had cause to excuse his abuse of the writ. He also obviously established prejudice, since the *Bailey* decision made it clear that Hanserd had been convicted for innocent behavior. The movants in *Sonshine* and *Green* could not establish cause because the new claims they sought to raise were not new or novel.

Unlike the prisoner in *Hanserd*, Byrd was on notice, certainly as early as his first federal habeas petition, that he could avail himself of the actual innocence/fundamental miscarriage of justice exception to excuse any procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *accord Sawyer v. Whitley*, 505 U.S. 333, 339 (1992); *Dugger v. Adams*, 489 U.S. 401, 411 n.6 (1989); *Smith v. Murray*, 477 U.S. 527, 537-38 (1986); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Engle v. Isaac*, 456 U.S. 107, 135 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 91 (1977); *see also McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Furthermore, Byrd also had to have known that actual innocence/miscarriage of justice" exception extends to abuse of the writ. *See Herrara v. Collins*, 506 U.S. 390, 404 (1993) ("In a series of cases culminating with *Sawyer v. Whitley*, 505

U.S. 333 . . . (1992), decided last Term, we have held that a petitioner otherwise subject to defenses of abusive or successive use of the writ may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence.  This rule, or fundamental miscarriage of justice exception, is grounded in the "equitable discretion" of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."); *Sawyer*, 505 U.S. 333, 339-40 (1992) ("We have previously held that even if a state prisoner cannot meet the cause and prejudice standard, a federal court may hear the merits of the successive claims if the failure to hear the claims would constitute a "miscarriage of justice."  In a trio of 1986 decisions [*Kuhlmann v. Wilson*, 477 U.S. 436 (1986), *Murray v. Carrier*, 477 U.S. 478 (1986); and *Smith v. Murray*, 477 U.S. 527, 537 (1986)] we elaborated on the miscarriage of justice, or "actual innocence," exception.  As we explained in *Kuhlmann,* the exception developed from the language of the federal habeas statute, which prior to 1966, allowed successive claims to be denied without a hearing if the judge were "satisfied that the ends of justice will not be served by such inquiry.")

In short, Byrd was on notice, as early as the filing of his first federal habeas petition in 1994, that his actual innocence claim, which he had admittedly known about since 1989, could have been raised and would have excused the procedural default of failing to raise it in the state courts. Instead, Byrd's actual innocence claim lay dormant through the filing and appeal of his first federal habeas petition and denial of certiorari, not to mention both the state appellate process and postconviction proceedings[6], and was not

---

[6]Byrd also could have brought a successive postconviction petition in the Ohio courts.  *See* Ohio Rev. Code § 2953.23(A) [pre-1995 version of the statute] (providing that "the court may, in its discretion and for good cause shown, entertain a second petition or successive petition for similar relief on behalf of the petitioner based upon the same facts *or newly discovered evidence*.  (Emphasis added.)  Furthermore, under the prior version of the statute, a postconviction petition could be filed "at any

---

**CONCURRENCE**

---

NATHANIEL R. JONES, Circuit Judge concurring in Order extending the Stay of Execution to October 8, 2001.

In light of Judge Boggs' amendment to his previous dissent, I must add two rebuttals to assertions it contains.  First, its challenge on the basis of "It is simply a lie", the statement that "the exigencies of the circumstances required the prompt entry of the Order to preserve the status quo", ignores the fact that the attempt by Judge Suhrheinrich to grant a stay until September 18 had failed.  Neither Judge Batchelder nor I concurred in that part of the Order. That meant that the execution date of September 12 remained in effect. I deemed that to be an "exigent circumstance."

The second rebuttal is note that the Clerk of Court was under a continuing directive from the Chief Judge to enter a stay Order he had previously prepared, at the appropriate time.  The Clerk of Courts was fully cognizant of the Chief Judge's desires with respect to that Order. When the Chief Judge was advised that a majority of the active judges (confirmed by the Clerk) had expressed a desire to join in the thirty day stay the Chief Judge had previously directed be entered at the appropriate time, the Clerk was advised to enter the Stay Order as modified to reflect the support of the  en banc majority.  He was to do so "at the direction of the Chief Judge."

Finally, the concurrence's reference to the tragic events of September 11 and their disruptive effects on proceedings of the Judicial Conference in Washington and  access to Judge Martin there, was meant only to note the obvious. He sought to perform his administrative and judicial duties on and after September 11, away from his Chambers, under the severe handicap created by that tragedy.

appropriately in this matter, assertions to the contrary notwithstanding.

resurrected until January 2001, nearly twelve years later after Byrd admittedly became aware of it. Thus, unlike the movant in *Hanserd*, Byrd *could have* raised his actual innocence claim in his first, pre-AEDPA federal habeas petition. *And Byrd actually knew this.* In an "Application for Stay of Proceedings to Allow Investigation and Discovery of Potential Claims and For Leave to Amend Petition to Comply With McClesky v. Zant*, 113 S.Ct. 1454 (1991)," filed on March 7, 1994, he stated:

> What [*McCleskey*] means to Petitioner Byrd is clear. He will have one chance to bring his habeas claims before the federal court. He and his counsel have the obligation to pursue all potential constitutional claims for which "reasonable investigation" may reveal previously unknown factual support.

For this reason, *Hanserd* and progeny are inapplicable. Furthermore, for the reasons we address next, pre-AEDPA law would not have entitled Byrd to raise the new habeas claims in any event. Thus, the application of pre-AEDPA law would not be "a difference that matters" entitling Byrd to pre-AEDPA standards under a *Landgraf* analysis.

---

time." Ohio Rev. Code § 2953.21. *See also State v. Byrd*, No. C-010379, – N.E.2d – , 2001 WL 950185 (Ohio Ct. App. Aug. 21, 2001) (per curiam).

As the Ohio Court of Appeals noted in its denial of Byrd's appeal of the state trial court's denial of his successive postconviction petition,

> [Byrd's] attorneys acknowledge that, since 1989, they have been in possession of an affidavit from co-defendant John Brewer stating that he, and not Byrd, fatally stabbed Tewksbury. Thus, Byrd cannot show that he was "unavoidably" prevented from presenting in a postconviction petition his claim of "actual innocence."

*Byrd*, 2001 WL 950185, at *4 .

### III.

### A.

Even if pre-AEDPA law applied to Byrd's case, Byrd's claim fails. First, and foremost, Byrd's case is the quintessential abuse of the writ -- as Byrd readily concedes, he deliberately withheld his actual innocence claim from his first federal habeas petition.

> Thus, for example, if a prisoner deliberately withholds one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground. . . . Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless, piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay.

*Sanders v. United States*, 373 U.S. 1, 18 (1963) (construing 1948 version of §2244; holding that new-claim successive petitions were barred "only if there had been some abuse of the writ," which the Court described as above). *See also United States v. MacDonald*, 966 F.2d 854, 860 (4th Cir. 1992) (holding that defense counsel's strategic decision to withhold certain evidence did not amount to cause; stating that "[s]uch deliberate by-pass clearly cannot survive abuse of the writ analysis on a second habeas appeal"; citing *McCleskey*); *Gunn v. Newsome*, 881 F.2d 949, 957 (11th Cir. 1989) ("If the petitioner knowingly and deliberately withheld the claim from a prior petition, then he has abused the writ."). Furthermore, as the Supreme Court's discussion in *McCleskey* of the history of the abuse of the writ doctrine makes clear, Byrd's deliberate abandonment of his actual innocence claim, although not the only example of conduct that disentitled a petitioner to relief, is the classic one. *See McCleskey*, 499 U.S. at 479-90 (discussing the origins and meaning of the abuse of the writ doctrine).

---

polling occurs. It is not a collaborative process nor is a plenary session required. Judges are polled in a variety of ways for they are often in locations remote from the seat of the court. On numerous occasions this court, faced with urgent deadlines in death penalty and other cases, has needed to make contact by telephone and the other expeditious methods of communication in order to ascertain the will of individual judges.

Moreover, the significance of the fact that this process took place in the midst of the catastrophic events of September 11 should not be lost on my colleagues. On that day, the Chief Judge was away from his home chambers in Washington D.C., attending sessions of the Judicial Conference of the United States. Everything in our nation's Capital was disrupted that day, necessitating even an evacuation of the Judicial Conference. Notwithstanding the difficulties of the moment, the Chief Judge was able to use the means available to him to conduct the affairs of this court and did so appropriately.

An action is taken in the name of the en banc court when a majority of the judges in "regular active service" votes a particular way on a particular issue. The method of ascertaining views is not prescribed. When a majority of the active judges registered their preference – by whatever means – the requirement was met. It should be noted that none of the en banc majority has questioned the procedures that led to the filing of the stay order.

At approximately the same time, the State of Ohio presented an application to United States Supreme Court Justice Stevens, as Circuit Justice, seeking to have the Supreme Court vacate the enlarged en banc stay. Upon referral to the entire Supreme Court, the application was denied, with three justices in dissent.

A majority of the active judges of this court felt that, in this emergency situation, a reasonable extension to October 8th was in order. Six justices of the United States Supreme Court voted not to disturb that decision. This court clearly acted

that in the interests of justice and fundamental fairness regarding this most final and irreversible of punishments, I was compelled to seek the longer stay.

I then spoke with Chief Judge Martin and a majority of the active judges. I expressed to each my views and urged them to consider my dissent to the panel majority's proposed order refusing realistic relief for the Petitioner, who faced death within thirty-six hours. Discussions between judges of this court are nothing new, especially in emergency situations such as the one involved here. Mr. Byrd was scheduled for execution at 10:00 a.m. September 12. Judge Suhrheinrich's proposed Order was received in chambers at 1:01 p.m. on the afternoon of September 10. However, before I had formalized a stay motion, on September 10, Judge Boggs, a non-panel member, interceded by filing an objection to the eight-day stay proposed by Judge Suhrheinrich and sought to have the en banc court vacate the stay. Judge Boggs also requested a polling of the active judges be taken by the Clerk of Courts regarding the stay.

The en banc court was thus activated by Judge Boggs's request. "Only Sixth Circuit judges in regular active service may cast votes on" an en banc poll. Sixth Circuit Internal Operating Procedure 35(a). In response to Judge Boggs's intervention seeking to vacate the eight-day stay, when polled, less than a majority of the en banc court favored his application. Instead, in individual communication with the Chief Judge and/or the Clerk of Courts, a majority favored extending the stay to October 8, 2001; pursuant to a directive to the Clerk of Courts by the Chief Judge, an Order to this effect was filed on September 11. The exigencies of the circumstances required the prompt entry of the Order to preserve the status quo.

There was nothing secretive or mysterious about the procedure. Judge Suhrheinrich states in his dissent that "[T]here was no discussion as to the views and opinions of the minority of the Court members." These views were quite well-known by virtue of the panel Opinion and the filing of the objection. There seldom is a joint discussion when the

Byrd acknowledges that he had in his possession since 1989 the affidavit of co-defendant Brewer, which he could have used in support of his earlier claim that Armstead's testimony was perjured. He has sat on this evidence, like a chicken waiting for an egg to hatch, for twelve years, despite repeated contact with both the state and federal courts. There is simply no legal excuse for this conduct.

What makes Byrd's abuse of the writ even more outrageous is the fact this Court actually gave him the opportunity – indeed directive – to raise his actual innocence claim. When we granted a stay of execution following the district court's initial denial in 1994 of Byrd's first habeas petition

> [a]mong other things, our order granted Petitioner "120 days to allow for further investigation and discovery of possible habeas claims," *id.* at 1187-88 [*Collins v. Byrd*, 510 U.S. 1185 (1994) (Scalia, J., dissenting from denial of the application to vacate stay of execution)] . . . as well as "leave . . . to amend the petition within sixty (60) days of this order *to include any newly discovered claims*[.] *Id.* at 1187-88[.]

*Byrd*, 209 F.3d at 499 (emphasis added).[7] Byrd sat on this evidence despite the explicit opportunity and express instruction to raise "any newly discovered claims." In light of this prior order, Byrd's deliberate silence then, and brazen attempt now to assert the claim, is nothing short of fraud on this Court.

---

[7]Byrd filed his federal habeas petition on March 7, 1994, only eight days before his scheduled execution. Byrd filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court rejected Byrd's habeas petition on grounds of inexcusable delay. We granted a stay of execution, however. The State filed an application to vacate the stay of execution in the United States Supreme Court, which was denied by Justice Stevens, over Justice Scalia's dissent. Our order stayed Byrd's execution for "120 days to allow for further investigation and discovery of possible habeas claims." *See Collins v. Byrd*, 510 U.S. 1185 (1994) (Scalia, J., dissenting); *see also Byrd v. Collins*, 209 F.3d F.3d 486, 499 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001).

In short, Byrd utterly fails to establish cause to excuse his abuse of the writ. Thus, Byrd cannot prevail, even under the pre-AEDPA cause and prejudice test excusing an abuse of the writ.

### B.

Even where the petitioner is unable to show cause and prejudice to excuse the abuse of the writ, he may yet be able to excuse the abuse and proceed with a second habeas petition.

> Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice. *Murray v. Carrier, supra*, 477 U.S. at 485, 106 S.Ct., at 2643.

*McCleskey*, 499 U.S. at 494; *see also Schlup*, 513 U.S. at 314-15 (quoting *McCleskey*). Again, Byrd is not exempted from the AEDPA's standards because the outcome of this case does not differ under this exception either.

Initially, we note that Byrd invokes the wrong actual innocence standard. Contrary to his assertion, the *Schlup* standard does not apply. In *Schlup*, the Supreme Court held that for a procedural claim of innocence (as opposed to a substantive constitutional claim of innocence as in *Herrara v. Collins*, 506 U.S. 390 (1993), to meet the miscarriage of justice exception to excuse abuse of the writ, the habeas petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new

---

### AMENDED CONCURRENCE

---

NATHANIEL R. JONES, Circuit Judge, concurring with the order granting the stay of execution to October 8, 2001, in which COLE, Circuit Judge, joins.

With the United States Supreme Court's September 12th (6-3) denial of the State of Ohio's application to lift the stay of execution entered by a majority of the active judges of this court on September 11, and the dissatisfaction the non-prevailing judges have expressed with the procedures of this court in this matter, I feel compelled to write in support of the order of a majority of the en banc court extending the stay of execution. In so doing, it is necessary to refute the gross mischaracterization and factual misstatements contained in the dissents filed in this case.

On Tuesday September 11, a majority of the active judges did the following two things with respect to this case: (1) declined to lift an eight-day stay of execution set out in the Order drafted by Judge Suhrheinrich, and (2) decided to grant a stay of execution until October 8, 2001.

How this took place is very simple. The three-judge panel consisting of Judges Suhrheinrich, Batchelder, and myself, split, 2 to 1, over the issue of Byrd's entitlement to file a second petition and his request for stay of execution. On Saturday, September 8, I requested that Judge Suhrheinrich join in granting a thirty-day stay of execution. He tentatively agreed to do so. However, on September 10, during a panel conference call, he proposed a stay of only eight days. Judge Batchelder objected in the strongest of terms and threatened to dissent. And she did dissent. I told Judge Suhrheinrich that I was withholding judgment until receipt of his Order. Upon reviewing the panel majority's twenty-five page Order and its injudicious language, I advised Judge Suhrheinrich, its author, orally and in writing, with a copy to Judge Batchelder,

**IT IS SO ORDERED.**

ENTERED BY ORDER OF THE COURT


/s/ Leonard Green
_____
Leonard Green, Clerk

evidence." *Schlup*, 513 U.S. at 327.[8] However, the *Schlup* standard applies to claims of actual innocence of the underlying conviction. *Id.* at 325. Byrd is not challenging his underlying conviction, but only his sentence. *See* Byrd's Memorandum in Support, at 1-2, 46 n.20. Thus, the appropriate standard of review here is the "clear and convincing standard found in *Sawyer*, "which was fashioned to reflect the relative importance of a claim of an erroneous sentence." *Id.*

In *Sawyer*, the Supreme Court held that in order for a court to reach the merits of a petitioner's successive claim that he is "actually innocent" of the death penalty, the petitioner "must show by clear and convincing evidence that, but for a

---

[8]Byrd indicates that he seeks to raise in his second or successive petition, the following claims:

> 1) A *Massiah* claim involving the state's use of informant Virgil Jordan to elicit statements from Byrd in violation of his Sixth Amendment right to counsel; 2) A claim that prosecutors presented testimony they knew was false when they had two witnesses identify a knife as the weapon used in the U-Totem robbery even after the crime lab concluded that the knife was not the one used in that robbery; 3) A claim that trial counsel were ineffective for failing to investigate and present testimony from available Workhouse inmates who could have revealed the scheme concocted by Ronald Armstead and Virgil Jordan to give false testimony against Byrd and his co-defendants; and 4) A substantive claim of actual innocence of the death penalty under *Herrara v. Collins*, 506 U.S. 390 (1993).

Byrd's Memorandum in Support at 46 n.20. On the surface it appears that Byrd is attempting to use his actual innocence claim as a "gateway through which a habeas petition must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315. In actuality, he is trying to use his actual innocence claim procedurally as the way to raise barred constitutional claims *and an also-barred substantive actual innocence claim.*

Furthermore, Byrd's claim that he could not have raised his actual innocence claim in the state court because Ohio did not at the time recognize actual innocence of the death penalty as a cognizable claim must be rejected, because he most certainly could have used it in support of his due process challenge to the sufficiency of the evidence. *See State v. Campbell*, 1997 WL 5182, at *3, No. C-950746 (Ohio Ct. App. Jan. 8, 1997) (per curiam).

constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Sawyer*, 505 U.S. at 336. Byrd cannot meet this standard.

Byrd's only evidence is the first Brewer affidavit. It was made in 1989, six years after he had been convicted and sentenced for his part in the Tewksbury robbery and murder. *See State v. Brewer*, No. C-830672, 1984 WL 6695 (Ohio Ct. App. July 18, 1984) (affirming Brewer's conviction on direct appeal). Thus, Brewer's confession was made only after he was no longer subject to further punishment for his actions in that robbery and murder. By waiting to provide the statement until 1989, Brewer could arguably shield both himself and Byrd from the death penalty because of double jeopardy. Such tactical maneuvers render the affidavit highly suspect.

Furthermore, Brewer's affidavit contradicts his own trial testimony. In August 1983, Brewer testified at his own trial. He stated that he did not participate in the killing of Monte Tewksbury and was not at the King Kwik. Brewer Tr. 874, 877. Not long after his trial, while awaiting placement in a state penal institution, Brewer told a prison social worker and a psychology assistant on August 18, and August 23, 1983, that Byrd killed Tewskbury. In September 1983, he also wrote letters to the parole authority stating that he did not want to be sent to the Lucasville prison, where Byrd and Woodall were, and reiterating that he knew nothing about the killing. (J.A. 211.)

Byrd acknowledges these facts in his Memorandum in Support, but nonetheless attempts to explain the inconsistency with his affidavits as "understandable" because "[t]wenty year old defendants who go on trial are not eager to be convicted of serious crimes with long sentences." Byrd's Memorandum in Support at 39. Byrd further attempts to minimize the absolute contradictions by proclaiming that "Brewer readily admits in his 2001 affidavit that his trial testimony was not truthful." *Id.* The question for this Court then is: "Was Brewer lying in 1983, was Brewer lying in 1989, or is he lying now?" This is certainly not the kind of "clear and

---

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

In re: JOHN W. BYRD, JR.,

                *Movant.*

No. 01-3927

_____

Refiled: September 14, 2001

_____

**ORDER**

_____

A member of the court has requested that the en banc court determine whether to vacate the stay of execution included in its September 10, 2001 decision on the movant's request for a determination that 28 U.S.C. §2244(b) does not apply to him, and his request for a stay of execution while he pursues a second federal habeas petition.

The request for an en banc determination has been referred to all of the active judges of the court, less than a majority of whom have voted in favor of vacating the stay. A majority of the active judges have voted to extend the stay of execution until October 8, 2001; in addition, the clerk of the court is directed to file and submit to the court any petition offered by a party seeking en banc review of the decision of the panel.

Under these circumstances:

> either the Supreme Court must reverse, at a minimum, the *extended* stay;

> this court must adopt new court rules explicitly allowing this type of currently lawless action; or

> we must recognize and confess that a majority of the court simply feels that it is not bound by law when it comes to some death-sentenced prisoners.

convincing evidence" that would prevent any reasonable juror from finding Byrd eligible for the death penalty.

There is also the dying declaration of the third co-defendant, William Woodall. Woodall was diagnosed late last year with terminal cancer. On January 29, 2001, he was rushed to the local hospital because he was suffering from "chest pains, possible heart attack." (J.A. 187.) Two prosecutors and a state highway patrolman went to see him. In signed affidavits recounting their interview, they claim that Woodall blamed Byrd for Tewksbury murder. Howard H. Hudson III, a staff lieutenant assigned to the Office of Investigative Services with the Ohio State Highway Patrol, stated in his affidavit that:

> 4.) Mr. Woodall expressed extreme remorse over the death of Monte Tewksbury, stated that he was dying from lung cancer and had been told he has no more than a year to live, and that he had made his peace with God.

> 5.) Mr. Woodall said that year ago while he was confined at the Southern Ohio Correctional Facility in Lucasville, Ohio, he signed affidavits for the Ohio Public Defender which were not true. He signed these at the request of inmate Johnny Brewer to help inmate John Byrd, Jr. Recently he has been asked on numerous occasions to meet with the Ohio Public Defender's representing John Byrd, Jr., but that he has refused to do so.

> 6.) Mr. Woodall said that Johnny Brewer never told him that he had killed Monte Tewksbury. Mr. Woodall was shown the statement in Johnny Brewer's affidavit numbered (11) wherein he stated "When I got back in the van I said to Danny Woodall, 'Man I stabbed a guy, take off.'" Mr. Woodall said that did not happen.

> 7.) Mr. Woodall stated that when John Byrd, Jr. and Johnny Brewer returned to the van after coming out of King Kwik, that John Byrd, Jr. had the knife.

8.) Mr. Woodall stated that while confined at the A Block of the Cincinnati Workhouse awaiting trial in 1983, John Byrd, Jr. told black inmates who were harassing him not to mess with him because he had already killed a man and wasn't afraid to kill again.

9.) Mr. Woodall said the owner of the van used during the murder of Monte Tewskbury, Leroy Tunstall, visited him in jail shortly after the crimes. Mr. Woodall told Leroy Tunstall that John Byrd, Jr. was the one who murdered Monte Tewksbury.

(J.A. 190-91.) Furthermore, Mark E. Piepmeier, an assistant Hamilton County Prosecutor, attested that:

2.) I visited Mr. Woodall at the London Correctional Facility on January 29, 2001, along with assistant Hamilton County Prosecutor William E. Breyer and St. Lt. Howard Hudson of the Ohio State Highway Patrol. . . .

3.) I was present when Mr. Woodall made the statements contained in the affidavit of Howard Hudson.

4.) I made a follow up visit to Mr. Woodall at the Ohio State University Hospital on Wednesday, January 31, 2001 along with assistant Hamilton County Prosecutor William E. Breyer.

5.) Mr. Breyer and I spoke to Mr. Woodall in a hospital room at the Ohio State University Hospital on January 31, 2001. Mr. Woodall said his medical condition had worsened and he realized he did not have long to live.

6.) Mr. Woodall confirmed that everything he had told myself, Mr. Breyer, and Howard Hudson on January 29, 2001 was true.

7.) Mr. Woodall said that Johnny Brewer had written to him several times and told him that he was going to lie

However, I cannot understand how a panel can render a decision on the merits, which affirmatively finds that the prisoner's claims have no merit, and then issue a stay to allow one member of the panel "additional time to consider the matter." We are not a "super-court" that supervises all executions in the states within our jurisdiction. Our jurisdiction is limited by Constitution and statute. The panel has determined all matters that come within that jurisdiction.

This court's power to issue a stay was therefore dubious at best (a fact that the panel apparently later recognized, since it removed all reference to the stay from its amended decision. *Compare* September 10, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case, and Granting a Temporary Stay of Execution until September 18, 2001, *with* September 11, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case). Then, however, the situation was exacerbated when the clerk of this court issued a much longer stay, apparently based on the word of one Article III judge that a majority of the active members of the court had approved it. This act was taken in response to no apparent motion, it had no jurisdictional basis, and it was done *without providing any notice to some members of the court*.

What we hold, apparently, is that death-sentenced prisoners need not resort to creative legal tactics to come within this court's jurisdiction. So prisoners may file anything, regardless of statute or prior law, and the en banc court may stay their execution for any length of time it chooses. For example, they could file a hot dog menu, and the en banc court might use that as a legal basis to stay their execution.

The truth may be that for *this* prisoner, a majority of the active members of *this* court would grant a stay based on a hot dog menu. This, however, is not a correct statement of the law (nor is it of any sort of law at all).

### DISSENT

BOGGS, Circuit Judge, dissenting from the refusal to vacate the panel's stay and dissenting from the order extending the stay.

The panel's order of September 11, 2001, Order Denying John Byrd's Motion to Determine whether 28 U.S.C. § 2244(b) of the AEDPA Applies to his Case, addresses Byrd's self-titled "Motion [to] Determine Whether 28 U.S.C. § 2244(b) of the AEDPA applies to His Case." However, procedurally Byrd's motion can only be one thing if it is to be properly before this court: an application pursuant to 28 U.S.C. § 2244(b)(3)(A), seeking permission of the court of appeals to file a second habeas petition. The panel dealt with Byrd's motion as such, *see id. at n.1*, and rendered a decision on the merits, first holding that § 2244(b) does apply to Byrd and then denying his request to file a second habeas petition. An order such as this, denying permission to file a second habeas petition, is not reviewable en banc. *See In re King*, 190 F.3d 479, 480-81 (6th Cir. 1999).

Alternatively, the panel may have found Byrd exempt from AEDPA. However, in that case, this court would have no jurisdiction over his petition, as a habeas petition must be filed first in district court. Had Byrd gone to district court, it is conceivable that action by the district court could be reviewed on appeal or en banc. However, our court cannot take jurisdiction over a non-AEDPA habeas petition in the first instance.

I can understand how a panel, faced with a last-minute motion, and out of an abundance of caution, could stay an execution while it is considering the motion. I can understand why a member of the panel, for tactical or other reasons, could request that the panel defer a ruling and issue a stay.

on behalf of Mr. Byrd, and encouraged Mr. Woodall to do the same.

(J.A. 188-89.)   Woodall died on April 8, 2001.

Woodall also implicated Byrd in August 1983, less than a month after his trial, when he told a prison social worker that he only drove the van and that Byrd said he stabbed the store clerk. In two letters written on August 29, 1983 and September 9, 1983, Woodall asked that he not be sent to Lucasville because Byrd was there and Byrd was mad at him. Woodall also indicted that Byrd was untruthfully blaming Brewer for the stabbing. (J.A. 192-95.)

Like Brewer's various statements over the years, Woodall's statements are contradictory. According to former inmate Dan Cahill, Woodall told him (while both were working as Ohio Prison Industries clerks) that Byrd did not stab Tewksbury and that the wrong man was on death row. (J.A. 118.) In 1993, Woodall signed an affidavit for the Ohio Public Defender's office in which he stated that Brewer, not Byrd, carried the knife at all times, and that when he left the King Kwik store, the knife Brewer was still carrying was covered with blood. (J.A. 196-97.)

Ironically, Byrd states in his Memorandum that he did not submit Woodall's affidavit in the state postconviction petition "because of concerns about his reliability." Byrd's Memorandum in Support, at 37. Brewer's varying statements share the same consistently inconsistent stories, and we share Byrd's "concerns about [Brewer's] reliability." In short, the evidence before us is hopelessly contradictory -- both internally and as between the two co-defendants. This is simply not clear and convincing evidence that would allow us to conclude that no reasonable juror would have found Byrd eligible for the death penalty. Byrd's evidence does not satisfy the *Sawyer* standard.

## IV.

Byrd asks us in the alternative to remand his case to the district court for an evidentiary hearing. However, the Ohio state courts have already rejected his new evidence of actual innocence, finding that it lacked any credibility. This factual finding is entitled to a presumption of correctness in later federal habeas corpus cases. *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *see also Ellis v. Collins*, 956 F.2d 76, 79 (5th Cir.) (holding that a state trial court's summary determination that affidavits lacked credibility was entitled to a presumption of correctness in federal habeas corpus proceedings), *cert. denied*, 503 U.S. 915 (1992). For the reasons articulated above, we find absolutely no basis to disturb that finding.

Byrd's request for an evidentiary hearing must also be rejected because he failed to diligently develop facts in support of his claim, and cannot show cause and prejudice. *See Williams v. Taylor*, 529 U.S. 420, 433-34 (2000) (noting that 28 U.S.C. § 2254's limitation on evidentiary hearings codifies and strengthens pre-AEDPA due diligence requirement established by *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)). And in all events, Byrd had a previous opportunity to explore his actual innocence – in his first federal habeas petition. Byrd's request is rejected.

## V.

Byrd's renewed attacks on trial witness Armstead's credibility, to the extent they are not barred under 28 U.S.C. § 2244(b)(1), do not provide proof of "actual innocence" sufficient to excuse an abuse of the writ. *Cf. Clark v. Lewis*, 1 F.3d 814, 824 (9th Cir. 1993) (allegation that prosecution witness could have been impeached by allegedly withheld evidence did not constitute a credible claim of "actual innocence" sufficient to show that the petitioner was actually innocent of the death penalty).

**IT IS SO ORDERED.**

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green

_____

Leonard Green, Clerk

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

In re: JOHN W. BYRD, JR.,
                *Movant.*

No. 01-3927

Refiled: September 12, 2001

————————

**ORDER**

————————

A member of the court has requested that the en banc court determine whether to vacate the stay of execution included in its September 10, 2001 decision on the movant's request for a determination that 28 U.S.C. §2244(b) does not apply to him, and his request for a stay of execution while he pursues a second federal habeas petition.

The request for an en banc determination has been referred to all of the active judges of the court, less than a majority of whom have voted in favor of vacating the stay. A majority of the active judges have voted to extend the stay of execution until October 8, 2001; in addition, the clerk of the court is directed to file and submit to the court any petition offered by a party seeking en banc review of the decision of the panel.

## VI.

For all the foregoing reasons, Byrd's request for an exemption from § 2244(b) of the AEDPA is **DENIED, AND A TEMPORARY STAY OF EXECUTION IS GRANTED UNTIL SEPTEMBER 18, 2001.** Further, because Byrd has cited no new rule of constitutional law, or provided any newly discovered evidence, the AEDPA bars the filing of any second or successive petition. Thus, Byrd's motion for stay of execution is **DENIED.**

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green

————————————————

Clerk

**CONCURRING IN PART, DISSENTING IN PART**

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part. I concur in the result reached in Judge Suhrheinrich's opinion and in the reasoning therein. I specifically dissent from the granting of a stay of execution and a continuance.

Understanding the procedural posture of this matter is critical to an understanding of why there is no legal basis upon which a stay of execution and a continuation of this matter may be granted. Byrd concedes that the initial determination of whether the AEDPA applies to this case must be made by this court, and not the district court. The vehicle for obtaining that determination is a motion under 28 U.S.C. 2244(b)(3) for an order authorizing the filing of a successive petition. Had Byrd simply filed his petition in the district court, that court would have been required under our precedent to transfer the matter here for our determination of whether to authorize the filing. *See In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997). In short, all roads lead to the requirement that Byrd specifically move for authority to file a successive petition.

Having been constrained to treat Byrd's motion as a motion under 28 U.S.C. § 2244(b)(3)(A), a majority of this panel has concluded that the motion must be denied because the AEDPA does apply to Byrd's attempt to obtain habeas relief, and that Byrd cannot satisfy the requirements imposed by the AEDPA on the filing of a successive habeas petition. *See* 28 U.S.C. § 2244 (b)(2) and (C). And that conclusion is neither appealable nor is it permitted to be the subject of a petition for rehearing or a petition for certiorari. *See* 28 U.S.C. § 2244(E).

Because the conclusions of the majority of this panel are final and not appealable, there is simply no basis for granting a stay of execution or a continuance.

**DISSENT**

NATHANIEL R. JONES, Circuit Judge, dissenting. I am convinced beyond doubt, that this court must carefully explore whether Byrd can satisfy the legal standard that would entitle him to file a second habeas petition. The complexity of the issues raised by the petitioner are of such scope and magnitude as to demand a careful and exhaustive analysis. I believe that the petition squarely implicates a question of fundamental fairness. Thus, a stay of execution is imperative. Byrd should not be put to death before this court is able to give full consideration to the issues raised in his case. *Steffen v. Tate*, 39 F.3d 622, 625 (6th Cir. 1994).

I dissent.

Because the conclusions of the majority of this panel are final and not appealable, there is simply no basis for granting a stay of execution or a continuance.

————————

**DISSENT**

————————

NATHANIEL R. JONES, Circuit Judge, dissenting. I am convinced beyond doubt, that this court must carefully explore whether Byrd can satisfy the legal standard that would entitle him to file a second habeas petition. The complexity of the issues raised by the petitioner are of such scope and magnitude as to demand a careful and exhaustive analysis. I believe that the petition squarely implicates a question of fundamental fairness. Thus, a stay of execution is imperative. Byrd should not be put to death before this court is able to give full consideration to the issues raised in his case. *Steffen v. Tate*, 39 F.3d 622, 625 (6th Cir. 1994).

I dissent.

No. 01-3927          FILED:  September 10, 2001

IN RE JOHN W. BYRD, JR., Movant

I request that the en banc court determine whether to vacate the 8-day stay of execution granted by a majority of the panel that considered Byrd's ambiguous motion, which the panel treated as a motion to file a second or successive habeas petition, and denied.

I can understand how a panel, faced with a last-minute motion, and out of an abundance of caution, could stay an execution while it is considering the motion.  I can understand why a member of the panel, for tactical or other reasons, could request that the panel defer a ruling and issue a stay.

However, I cannot understand how a panel can render a decision on the merits, which affirmatively finds that the prisoner's claims and tactics have no merit, and then issue a stay to allow one member of the panel "additional time to consider the matter."  We are not a "super-court" that supervises all executions in the states within our jurisdiction.  Our jurisdiction is limited by Constitution and statute.  The panel has determined all matters that come within that jurisdiction.

In my opinion, it is therefore simply lawless to stay an execution as a matter of comity to one member of the panel, when there is no jurisdictional basis for doing so.

/s/ Danny J. Boggs

_____

Danny J. Boggs
Circuit Judge

_____

## CONCURRENCE

_____

ALICE  M.  BATCHELDER,  Circuit  Judge,  separate concurrence.   I concur entirely in Judge Suhrheinrich's opinion.  I write separately to point out that there is no legal basis whatsoever for the stay of execution purportedly granted by a majority of the en banc court, apparently on an oral motion and with notice to only some of the members of this court.

Understanding  the  procedural  posture  of  this  matter  is critical to an understanding of why there is no legal basis upon which a stay of execution and a continuation of this matter  may  be  granted.   Byrd  concedes  that  the  initial determination of whether the AEDPA applies to this case must be made by this court, and not the district court.  The vehicle for obtaining that determination is a motion under 28 U.S.C.  2244(b)(3)  for  an  order  authorizing  the  filing  of  a successive petition.  Had Byrd simply filed his petition in the district court, that court would have been required under our precedent to transfer the matter here for our determination of whether to authorize the filing.  *See In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997).  In short, all roads lead to the requirement that Byrd specifically move for authority to file a successive petition.

Having been constrained to treat Byrd's motion as a motion under 28 U.S.C. § 2244(b)(3)(A), a majority of this panel has concluded  that  the  motion  must  be  denied  because  the AEDPA does apply to Byrd's attempt to obtain habeas relief, and that Byrd cannot satisfy the requirements imposed by the AEDPA on the filing of a successive habeas petition.  *See* 28 U.S.C. § 2244 (b)(2) and (C).  And that conclusion is neither appealable nor is it permitted to be the subject of a petition for rehearing  or  a  petition  for  certiorari.   *See*  28  U.S.C. § 2244(E).

law, or provided any newly discovered evidence, the AEDPA bars the filing of any second or successive petition.   Thus, Byrd's motion for stay of execution is **DENIED.**

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green

Clerk

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re:  JOHN W. BYRD, JR.,

*Movant.*

No. 01-3927

Filed:  September 11, 2001

### ORDER

A member of the court has requested that the en banc court determine whether to vacate the stay of execution included in its September 10, 2001 decision on the movant's request for a determination that 28 U.S.C. §2244(b) does not apply to him, and his request for a stay of execution while he pursues a second federal habeas petition.

The request for an en banc determination has been referred to all of the active judges of the court, less than a majority of whom have voted in favor of vacating the  stay.  A majority of the active judges have voted to extend the stay of execution until October 8, 2001; in addition, the clerk of the court is directed to file and submit to the court any petition offered by a party seeking en banc review of the decision of the panel.

**IT IS SO ORDERED.**

ENTERED BY ORDER OF THE COURT


/s/ Leonard Green
_____
Leonard Green, Clerk

1038 (1984); *see also Ellis v. Collins*, 956 F.2d 76, 79 (5th Cir.) (holding that a state trial court's summary determination that affidavits lacked credibility was entitled to a presumption of correctness in federal habeas corpus proceedings), *cert. denied*, 503 U.S. 915 (1992). For the reasons articulated above, we find absolutely no basis to disturb that finding.

Byrd's request for an evidentiary hearing must also be rejected because he failed to diligently develop facts in support of his claim, and cannot show cause and prejudice. *See Williams v. Taylor*, 529 U.S. 420, 433-34 (2000) (noting that 28 U.S.C. § 2254's limitation on evidentiary hearings codifies and strengthens pre-AEDPA due diligence requirement established by *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)). And in all events, Byrd had a previous opportunity to explore his actual innocence – in his first federal habeas petition. Byrd's request is rejected.

## V.

Byrd's renewed attacks on trial witness Armstead's credibility, to the extent they are not barred under 28 U.S.C. § 2244(b)(1), do not provide proof of "actual innocence" sufficient to excuse an abuse of the writ. *Cf. Clark v. Lewis*, 1 F.3d 814, 824 (9th Cir. 1993) (allegation that prosecution witness could have been impeached by allegedly withheld evidence did not constitute a credible claim of "actual innocence" sufficient to show that the petitioner was actually innocent of the death penalty).

## VI.

For all the foregoing reasons, Byrd's request for an exemption from § 2244(b) of the AEDPA is **DENIED.** Further, because Byrd has cited no new rule of constitutional

Woodall also implicated Byrd in August 1983, less than a month after his trial, when he told a prison social worker that he only drove the van and that Byrd said he stabbed the store clerk. In two letters written on August 29, 1983 and September 9, 1983, Woodall asked that he not be sent to Lucasville because Byrd was there and Byrd was mad at him. Woodall also indicted that Byrd was untruthfully blaming Brewer for the stabbing. (J.A. 192-95.)

Like Brewer's various statements over the years, Woodall's statements are contradictory. According to former inmate Dan Cahill, Woodall told him (while both were working as Ohio Prison Industries clerks) that Byrd did not stab Tewksbury and that the wrong man was on death row. (J.A. 118.) In 1993, Woodall signed an affidavit for the Ohio Public Defender's office in which he stated that Brewer, not Byrd, carried the knife at all times, and that when he left the King Kwik store, the knife Brewer was still carrying was covered with blood. (J.A. 196-97.)

Ironically, Byrd states in his Memorandum that he did not submit Woodall's affidavit in the state postconviction petition "because of concerns about his reliability." Byrd's Memorandum in Support, at 37. Brewer's varying statements share the same consistently inconsistent stories, and we share Byrd's "concerns about [Brewer's] reliability." In short, the evidence before us is hopelessly contradictory -- both internally and as between the two co-defendants. This is simply not clear and convincing evidence that would allow us to conclude that no reasonable juror would have found Byrd eligible for the death penalty. Byrd's evidence does not satisfy the *Sawyer* standard.

## IV.

Byrd asks us in the alternative to remand his case to the district court for an evidentiary hearing. However, the Ohio state courts have already rejected his new evidence of actual innocence, finding that it lacked any credibility. This factual finding is entitled to a presumption of correctness in later federal habeas corpus cases. *Patton v. Yount*, 467 U.S. 1025,

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re: JOHN W. BYRD, JR.,
          *Movant.*

No. 01-3927



Filed:  September 11, 2001

Before:  JONES, SUHRHEINRICH, BATCHELDER,
Circuit Judges.

---

**AMENDED ORDER DENYING JOHN BYRD'S MOTION TO DETERMINE WHETHER 28 U.S.C. § 2244(b) OF THE AEDPA APPLIES TO HIS CASE**

---

SUHRHEINRICH, Circuit Judge. Movant John W. Byrd, scheduled to be executed by the State of Ohio on September 12, 2001 at 10 a.m., seeks a stay of execution while he pursues a second federal habeas petition.[1] Byrd also asks this

---

[1] Byrd does not characterize his motion as such. Rather, the motion is styled as "John Byrd's Motion [to] Determine Whether 28 U.S.C. § 2244(b) of the AEDPA Applies to His Case." As relief, he requests that "this Court [] determine that § 2244 of the AEDPA does not apply to him." In the alternative he "asks the Court to grant a stay and remand his case to the district court for an evidentiary hearing into whether his evidence meets *Schlup's* actual innocence gateway standard for filing a second petition." He also states that "[i]f the Court determines that § 2244(b) does not apply to Byrd's case, he will immediately file in the district court the second habeas petition he tendered to this motion." However cast, Byrd is seeking the  permission required by 28 U.S.C.

Court to determine that 28 U.S.C. § 2244(b), the Anti-Terrorism and Effective Death Penalty Act, "AEDPA," which bars second or successive petitions unless they are based on facts which could not have been discovered previously through the exercise of due diligence, does not apply to him. For the following reasons, Byrd's motion for stay of execution is **DENIED.** Byrd's request to file a second habeas petition is also **DENIED** as barred under § 2244(b) of the AEDPA.

## I.

Byrd was convicted by a jury and sentenced in 1983. He was originally scheduled to be executed on January 27, 1984. Byrd's convictions and sentences were upheld on direct appeal to the Ohio Court of Appeals, *see State v. Byrd*, No. C-830676, B-831662 (Ohio Ct. App. Feb. 5 1986), on direct appeal to the Ohio Supreme Court, *see State v. Byrd*, 512 N.E.2d 611 (Ohio 1987), and the Supreme Court denied certiorari. *See Byrd v. Ohio*, 484 U.S.1037 (1988). Byrd also filed a motion for a new trial in December 1983, which the trial court denied in September 1989. The Ohio Court of Appeals upheld the trial court, *see State v. Byrd*, No. C-890659 (Ohio Ct. App. Feb. 13, 1991), and the Ohio Supreme Court subsequently declined jurisdiction. *See State v. Byrd*, 574 N.E.2d 1092 (Ohio 1991).

In 1988 Byrd filed his first petition for state postconviction relief, which the trial court denied. The Ohio Court of Appeals reversed in 1991 and remanded the case for further proceedings. On remand the trial court again entered summary judgment for the state, and Byrd appealed. The Ohio Court of Appeals affirmed, *see State v. Byrd*, No C-910340 (Ohio Ct. App. Feb. 26, 1992), and the Ohio Supreme Court declined jurisdiction. *See State v. Byrd*, 596 N.E.2d 472 (Ohio 1992).

---

§ 2244(b)(3)(A) to file as second habeas petition.

(J.A. 190-91.) Furthermore, Mark E. Piepmeier, an assistant Hamilton County Prosecutor, attested that:

2.) I visited Mr. Woodall at the London Correctional Facility on January 29, 2001, along with assistant Hamilton County Prosecutor William E. Breyer and St. Lt. Howard Hudson of the Ohio State Highway Patrol. . . .

3.) I was present when Mr. Woodall made the statements contained in the affidavit of Howard Hudson.

4.) I made a follow up visit to Mr. Woodall at the Ohio State University Hospital on Wednesday, January 31, 2001 along with assistant Hamilton County Prosecutor William E. Breyer.

5.) Mr. Breyer and I spoke to Mr. Woodall in a hospital room at the Ohio State University Hospital on January 31, 2001. Mr. Woodall said his medical condition had worsened and he realized he did not have long to live.

6.) Mr. Woodall confirmed that everything he had told myself, Mr. Breyer, and Howard Hudson on January 29, 2001 was true.

7.) Mr. Woodall said that Johnny Brewer had written to him several times and told him that he was going to lie on behalf of Mr. Byrd, and encouraged Mr. Woodall to do the same.

(J.A. 188-89.)    Woodall died on April 8, 2001.

Hudson III, a staff lieutenant assigned to the Office of Investigative Services with the Ohio State Highway Patrol, stated in his affidavit that:

4.)  Mr. Woodall expressed extreme remorse over the death of Monte Tewksbury, stated that he was dying from lung cancer and had been told he has no more than a year to live, and that he had made his peace with God.

5.)  Mr. Woodall said that year ago while he was confined at the Southern Ohio Correctional Facility in Lucasville, Ohio, he signed affidavits for the Ohio Public Defender which were not true.  He signed these at the request of inmate Johnny Brewer to help inmate John Byrd, Jr.  Recently he has been asked on numerous occasions to meet with the Ohio Public Defender's representing John Byrd, Jr., but that he has refused to do so.

6.) Mr. Woodall said that Johnny Brewer never told him that he had killed Monte Tewksbury.  Mr. Woodall was shown the statement in Johnny Brewer's affidavit numbered (11) wherein he stated "When I got back in the van I said to Danny Woodall, 'Man I stabbed a guy, take off.'"  Mr. Woodall said that did not happen.

7.)  Mr. Woodall stated that when John Byrd, Jr. and Johnny Brewer returned to the van after coming out of King Kwik, that John Byrd, Jr. had the knife.

8.)  Mr. Woodall stated that while confined at the A Block of the Cincinnati Workhouse awaiting trial in 1983, John Byrd, Jr. told black inmates who were harassing him not to mess with him because he had already killed a man and wasn't afraid to kill again.

9.) Mr. Woodall said the owner of the van used during the murder of Monte Tewskbury, Leroy Tunstall, visited him in jail shortly after the crimes.  Mr. Woodall told Leroy Tunstall that John Byrd, Jr. was the one who murdered Monte Tewksbury.

Byrd filed his initial petition for writ of habeas corpus under 28 U.S.C. § 2254(d) on March 7, 1994.  The district court denied an evidentiary hearing and habeas relief in 1995.  *Byrd v. Collins*, No. C-1-94-167, slip. op. (S.D. Ohio July 28, 1995); *Byrd v. Collins*, No. C-1-94-167, slip. op. Nov. 2, 1995).  Last year, over dissent, this Court affirmed the judgment of the district court.  *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000).[2]  A divided court denied Byrd's petition for rehearing *en banc*.  *Byrd v. Collins*, No. 96-3202, *amended en banc order*  (6th Cir. Aug. 22, 2000).  The United States Supreme Court denied Byrd's petition for writ of certiorari on January 8, 2001.  *Byrd v. Collins*, 531 U.S. 1082 (2001).  The district court subsequently issued a mandate dismissing Byrd's habeas petition on January 25, 2001.

On January 26, 2001, Byrd filed a motion in the Ohio Supreme Court seeking a stay of execution to permit him to litigate the issue of his actual innocence of the death penalty.  On March 20, 2001, the Ohio Supreme Court issued an entry permitting Byrd to file a second state post-conviction petition in the trial court and remanding the case for a hearing on the claim that he was actually innocent of the death penalty.  The Ohio Supreme Court's entry set Byrd's execution date for September 12, 2001.  *State v. Byrd*, 744 N.E.2d 190 (2001).

Byrd filed a petition for post-conviction relief in the Hamilton County, Ohio, trial court on April 9, 2001.  In it he raised, *inter alia,* the claim that he was actually innocent of the death penalty.  Byrd based his first claim on the 1989 affidavit of co-defendant John Brewer, in which Brewer alleges that he, not Byrd, actually murdered Monte Tewksbury.  In his second claim Byrd alleged that the trial testimony of state's witness Ronald Armstead and the grand jury testimony of state witness Virgil Jordan were not credible.  He also requested discovery of records from the prosecutor's office and the state department of corrections.  The trial court denied Byrd's discovery requests and

---

[2]For a thorough review of the underlying events, *see Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001).

dismissed Byrd's post-conviction petition without an evidentiary hearing on May 25, 2001. *State Byrd*, No. B-831662(A) (Hamilton C.P. May 25, 2001). Regarding the Brewer affidavit, the court held:

> Byrd and his attorneys agree that they received Brewer's 1989 affidavit in 1989. For tactical reasons, they did not file the affidavit or make it known to this or any court at that time even though Byrd had a motion for a new trial pending at that time. Byrd, in 1989, was pursuing an appeal and a motion for new trial contending in part that Byrd was not even at the scene of the crime on the night in question. Brewer's affidavit puts Byrd squarely at the crime scene.
>
> As a consequence of this tactical decision by Byrd and his attorneys, Byrd is now barred, under Criminal Rule 33, from filing a motion for a new trial because, as his attorney conceded in oral argument, the 1989 affidavit is not newly discovered evidence.
>
> Byrd and his attorneys now insist that the 1989 affidavit is true. Thus, Byrd concedes that the position he pursued in court for so long, that he was not at the crime scene, is untrue. Byrd now concedes that he was there but that Brewer, not Byrd, stabbed the victim.
>
> The affidavit of Brewer in 1989 lacks any credibility whatsoever. The 1989 affidavit is inconsistent with his 2001 affidavit to say nothing of his sworn testimony at his trial. As the State accurately points out, Brewer continued to make statements identifying Byrd as the principal offender well into his period of incarceration to a variety of people. The Brewer affidavit lacks any credibility for a variety of reasons including those cited by the State during oral argument. The affidavits fail to meet the standard set forth in *Herrara v. Collins*, 506 U.S. 390 (1993).

The trial court ruled that the claim of actual innocence based on Armstead's lack of credibility was barred by res judicata.

was no longer subject to further punishment for his actions in that robbery and murder. By waiting to provide the statement until 1989, Brewer could arguably shield both himself and Byrd from the death penalty because of double jeopardy. Such tactical maneuvers render the affidavit highly suspect.

Furthermore, Brewer's affidavit contradicts his own trial testimony. In August 1983, Brewer testified at his own trial. He stated that he did not participate in the killing of Monte Tewksbury and was not at the King Kwik. Brewer Tr. 874, 877. Not long after his trial, while awaiting placement in a state penal institution, Brewer told a prison social worker and a psychology assistant on August 18, and August 23, 1983, that Byrd killed Tewskbury. In September 1983, he also wrote letters to the parole authority stating that he did not want to be sent to the Lucasville prison, where Byrd and Woodall were, and reiterating that he knew nothing about the killing. (J.A. 211.)

Byrd acknowledges these facts in his Memorandum in Support, but nonetheless attempts to explain the inconsistency with his affidavits as "understandable" because "[t]wenty year old defendants who go on trial are not eager to be convicted of serious crimes with long sentences." Byrd's Memorandum in Support at 39. Byrd further attempts to minimize the absolute contradictions by proclaiming that "Brewer readily admits in his 2001 affidavit that his trial testimony was not truthful." *Id.* The question for this Court then is: "Was Brewer lying in 1983, was Brewer lying in 1989, or is he lying now?" This is certainly not the kind of "clear and convincing evidence" that would prevent any reasonable juror from finding Byrd eligible for the death penalty.

There is also the dying declaration of the third co-defendant, William Woodall. Woodall was diagnosed late last year with terminal cancer. On January 29, 2001, he was rushed to the local hospital because he was suffering from "chest pains, possible heart attack." (J.A. 187.) Two prosecutors and a state highway patrolman went to see him. In signed affidavits recounting their interview, they claim that Woodall blamed Byrd for Tewksbury murder. Howard H.

standard applies to claims of actual innocence of the underlying conviction. *Id.* at 325. Byrd is not challenging his underlying conviction, but only his sentence. *See* Byrd's Memorandum in Support, at 1-2, 46 n.20. Thus, the appropriate standard of review here is the "clear and convincing standard found in *Sawyer*, "which was fashioned to reflect the relative importance of a claim of an erroneous sentence." *Id.*

In *Sawyer*, the Supreme Court held that in order for a court to reach the merits of a petitioner's successive claim that he is "actually innocent" of the death penalty, the petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Sawyer*, 505 U.S. at 336. Byrd cannot meet this standard.

Byrd's only evidence is the first Brewer affidavit. It was made in 1989, six years after he had been convicted and sentenced for his part in the Tewksbury robbery and murder. *See State v. Brewer*, No. C-830672, 1984 WL 6695 (Ohio Ct. App. July 18, 1984) (affirming Brewer's conviction on direct appeal). Thus, Brewer's confession was made only after he

---

false testimony against Byrd and his co-defendants; and 4) A substantive claim of actual innocence of the death penalty under *Herrara v. Collins*, 506 U.S. 390 (1993).

Byrd's Memorandum in Support at 46 n.20. On the surface it appears that Byrd is attempting to use his actual innocence claim as a "gateway through which a habeas petition must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315. In actuality, he is trying to use his actual innocence claim procedurally as the way to raise barred constitutional claims *and an also-barred substantive actual innocence claim.*

Furthermore, Byrd's claim that he could not have raised his actual innocence claim in the state court because Ohio did not at the time recognize actual innocence of the death penalty as a cognizable claim must be rejected, because he most certainly could have used it in support of his due process challenge to the sufficiency of the evidence. *See State v. Campbell*, 1997 WL 5182, at *3, No. C-950746 (Ohio Ct. App. Jan. 8, 1997) (per curiam).

The Ohio Court of Appeals affirmed the trial court's judgment on August 21, 2001. *State v. Byrd*, No. C-010379, 2001 WL 950185 (Hamilton Ct. App. Aug, 21, 2001) (per curiam). The appeals court stated in relevant part:

In his first claim for relief, Byrd contended that he was "actually innocent" of aggravated murder because his co-defendant John Brewer killed Tewksbury. Byrd cited to portions of the trial transcript and material adduced at his trial to demonstrate that Brewer was the killer. Byrd additionally presented two affidavits signed by Brewer on May 16, 1989, and January 24, 2001, respectively, in which Brewer claimed that he, and not Byrd, fatally stabbed Tewksbury. Byrd also presented the affidavit of Dan Cahill, a fellow inmate of Brewer at the Southern Ohio Correctional Facility, who claimed that Brewer had told him that he murdered Tewksbury.

. . .

In this case, the trial court dismissed Byrd's claim of "actual innocence" for two reasons: first, because it did not give rise to a constitutional violation in the proceedings that resulted in his conviction; and second, because the evidentiary basis for the claim– John Brewer's statement that he had actually killed Tewksbury--"lacked any credibility whatsoever." We agree. . . . With respect to the second reason, we note, under *Herrara*, *supra*, that the evidentiary threshold for a claim of actual innocence is "extraordinarily high." On the state of the record in this case, the trial court was entitled to conclude that the evidence provided by Byrd in the affidavits fell "far short" of that which would have been necessary to make out a cognizable constitutional claim.

– N.E.2d at – , 2001 WL 950185, at * 5-7 (footnote omitted). The Ohio Court of Appeals also agreed with the trial court's conclusion that Byrd's second claim challenging Armstead's credibility was barred by res judicata because it had been

raised at his trial, on appeal, in his first postconviction petition, and in federal habeas corpus proceedings.

On August 29, 2001, the Ohio Supreme Court declined jurisdiction and dismissed the appeal "as not involving any substantial constitutional question." *State v. Byrd*, Case No. 01-1515 (August 29, 2001).

## II.

Under the AEDPA, a petitioner is required, prior to filing a second or successive habeas corpus petition in the district court, to seek authorization "in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A).[3] Under the AEDPA, a second or successive habeas corpus application under § 2254 that was not presented in a prior application "shall be dismissed unless" the applicant shows "the factual predicate" for his new claim of innocence "could not have been discovered previously through the exercise of due

---

[3]Under 28 U.S.C. § 2244(b)(3)(C), "[t]he court of appeals may authorize the filing of a second or successive application only if it determines that the application makes  prima facie showing that the application satisfies the requirements of this subsection." Furthermore, "[t]he grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3)(E). *See also In re King*, 190 F.3d 479 (6th Cir. 1999) (en banc) (holding that denial of permission to file a second or successive habeas petition under AEDPA is not subject to en banc review). Although Byrd's initial federal habeas petition predated the effective date of the AEDPA, this attempt at filing a second habeas petition is clearly governed by the AEDPA. *Cf. Slack v. McDaniel*, 529 U.S. 473 (2000) (holding that an appeal from the dismissal of a habeas corpus petition after the effective date of the AEDPA is governed by AEDPA, regardless of whether the habeas petition was filed in the district court before or after AEDPA's effective date). *See also Steward v. Martinez-Villareal*, 523 U.S. 637, 643 (1998) (noting that had the prisoner's current request for relief been a second application, it "plainly should have been dismissed" under § 2244(b) of the AEDPA, even though his initial federal habeas petition was filed in 1993, prior to the enactment of the AEDPA).

---

to excuse the abuse and proceed with a second habeas petition.

Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default.  These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.  We have described this class of cases as implicating a fundamental miscarriage of justice.  *Murray v. Carrier, supra*, 477 U.S. at 485, 106 S.Ct., at 2643.

*McCleskey*, 499 U.S. at 494; *see also Schlup*, 513 U.S. at 314-15 (quoting *McCleskey*).  Again, Byrd is not exempted from the AEDPA's standards because the outcome of this case does not differ under this exception either.

Initially, we note that Byrd invokes the wrong actual innocence standard.  Contrary to his assertion, the *Schlup* standard does not apply.  In *Schlup*, the Supreme Court held that for a procedural claim of innocence (as opposed to a substantive constitutional claim of innocence as in *Herrara v. Collins*, 506 U.S. 390 (1993), to meet the miscarriage of justice exception to excuse abuse of the writ, the habeas petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327.[8]  However, the *Schlup*

---

[8]Byrd indicates that he seeks to raise in his second or successive petition, the following claims:

1) A *Massiah* claim involving the state's use of informant Virgil Jordan to elicit statements from Byrd in violation of his Sixth Amendment right to counsel; 2) A claim that prosecutors presented testimony they knew was false when they had  two witnesses identify a knife as the weapon used in the U-Totem robbery even after the crime lab concluded that the knife was not the one used in that robbery; 3) A claim that trial counsel were ineffective for failing to investigate and present testimony from available Workhouse inmates who could have revealed the scheme concocted by Ronald Armstead and Virgil Jordan to give

we granted a stay of execution following the district court's initial denial in 1994 of Byrd's first habeas petition

> [a]mong other things, our order granted Petitioner "120 days to allow for further investigation and discovery of possible habeas claims," *id.* at 1187-88 [*Collins v. Byrd*, 510 U.S. 1185 (1994) (Scalia, J., dissenting from denial of the application to vacate stay of execution)] . . . as well as "leave . . . to amend the petition within sixty (60) days of this order *to include any newly discovered claims*[.] *Id.* at 1187-88[.]

*Byrd*, 209 F.3d at 499 (emphasis added).[7]  Byrd sat on this evidence despite the explicit opportunity and express instruction to raise "any newly discovered claims." In light of this prior order, Byrd's deliberate silence then, and brazen attempt now to assert the claim, is nothing short of fraud on this Court.

In short, Byrd utterly fails to establish cause to excuse his abuse of the writ. Thus, Byrd cannot prevail, even under the pre-AEDPA cause and prejudice test excusing an abuse of the writ.

**B.**

Even where the petitioner is unable to show cause and prejudice to excuse the abuse of the writ, he may yet be able

---

[7] Byrd filed his federal habeas petition on March 7, 1994, only eight days before his scheduled execution. Byrd filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court rejected Byrd's habeas petition on grounds of inexcusable delay. We granted a stay of execution, however. The State filed an application to vacate the stay of execution in the United States Supreme Court, which was denied by Justice Stevens, over Justice Scalia's dissent. Our order stayed Byrd's execution for "120 days to allow for further investigation and discovery of possible habeas claims." *See Collins v. Byrd*, 510 U.S. 1185 (1994) (Scalia, J., dissenting); *see also Byrd v. Collins*, 209 F.3d F.3d 486, 499 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001).

---

diligence," or that the claim "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2244(2)(A) & (B).[4]

Byrd does not rely on a new rule of constitutional law and he openly admits that he cannot establish that the factual predicate for his new claim is newly discovered. *See* Byrd's Memorandum in Support at 17 ("John Byrd has not claimed and could not claim that he has *newly discovered* evidence of actual innocence of the death penalty as defined in § 2244(b) of AEDPA.") (Emphasis in original.) This is the case because Byrd deliberately chose not to use his proof of actual innocence – Brewer's statements – in support of his initial state post-conviction petition, and he likewise chose not to cite Brewer's affidavit in his first federal habeas petition. Thus, as Byrd concedes, he cannot satisfy § 2244(b)'s requirements.

Instead, he argues that under pre-AEDPA "abuse of the writ" decisions, habeas petitioners were allowed to file second or successive petitions raising claims that were or could have been raised earlier when the petitioner met the "actual innocence/fundamental miscarriage of justice" exception, as defined by the Supreme Court in *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991), and *Schlup v. Delo*, 513 U.S. 298 (1995). Byrd asserts that the pre-AEDPA "abuse of the writ" standard, rather than § 2244(b), should apply to his case because his initial habeas petition was filed prior to the effective date of the AEDPA, and the application of the AEDPA standards would have an "impermissibly retroactive effect." He cites our decisions in *In re Hanserd*, 123 F.3d 922 (6th Cir. 1997) and *In re Sonshine*, 132 F.3d 1133 (6th Cir. 1997) in support of his argument.

---

[4] Section 2244(b)(2) contains a third basis for permitting a second or successive petition, that is not relevant in this case.

Our initial inquiry is whether provisions of the AEDPA apply to this case. *See In re Green*, 144 F.3d 384, 385 (6th Cir. 1998) (per curiam).[5]

> When a case implicates a federal statute enacted after the events in suit, and Congress has not expressly prescribed the statute's proper reach, the court must determine whether the new statute would have a retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280-81 . . . (1994).

*Id.* at 386. In *Hanserd*, we determined that Congress has not expressed any clear intent as to the statute's proper reach. *See Hanserd*, 123 F.3d at 924. We must therefore determine whether the provisions of the AEDPA apply to this case, resorting to *Landgraf's* default rules to decide whether AEDPA may be applied here. *See id.*

In *Hanserd*, the petitioner, who pleaded guilty to using a firearm in a drug trafficking offense, in violation of 18 U.S.C. § 924(c), filed his initial § 2255 in 1995, arguing that his drug conviction violated the Double Jeopardy Clause. The district court denied the motion in July 1995, and we affirmed on appeal. *See Hanserd v. United States*, 89 F.3d 833, 1996 WL 316491 (6th Cir. June 10, 1996). While that appeal was pending, the Supreme Court announced its decision in *Bailey v. United States*, 516 U.S. 137 (1995), on December 6, 1995. *Bailey* held that the lower courts, including our own, had been sustaining convictions under § 924(c) for innocent behavior. On November 6, 1996, after the effective date of the AEDPA, Hanserd filed a motion with this court seeking leave to file a second or successive petition in the district court based upon the intervening *Bailey* decision. Specifically, Hanserd

---

[5] Byrd likewise acknowledges that this question must be decided by this Court, and not the district court. *See Hanserd*, 123 F.3d at 934; *Sonshine*, 132 F.3d at 1134.

> of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground. . . . Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless, piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay.

*Sanders v. United States*, 373 U.S. 1, 18 (1963) (construing 1948 version of §2244; holding that new-claim successive petitions were barred "only if there had been some abuse of the writ," which the Court described as above). *See also United States v. MacDonald*, 966 F.2d 854, 860 (4th Cir. 1992) (holding that defense counsel's strategic decision to withhold certain evidence did not amount to cause; stating that "[s]uch deliberate by-pass clearly cannot survive abuse of the writ analysis on a second habeas appeal"; citing *McCleskey*); *Gunn v. Newsome*, 881 F.2d 949, 957 (11th Cir. 1989) ("If the petitioner knowingly and deliberately withheld the claim from a prior petition, then he has abused the writ."). Furthermore, as the Supreme Court's discussion in *McCleskey* of the history of the abuse of the writ doctrine makes clear, Byrd's deliberate abandonment of his actual innocence claim, although not the only example of conduct that disentitled a petitioner to relief, is the classic one. *See McCleskey*, 499 U.S. at 479-90 (discussing the origins and meaning of the abuse of the writ doctrine).

Byrd acknowledges that he had in his possession since 1989 the affidavit of co-defendant Brewer, which he could have used in support of his earlier claim that Armstead's testimony was perjured. He has sat on this evidence, like a chicken waiting for an egg to hatch, for twelve years, despite repeated contact with both the state and federal courts. There is simply no legal excuse for this conduct.

What makes Byrd's abuse of the writ even more outrageous is the fact this Court actually gave him the opportunity – indeed directive – to raise his actual innocence claim. When

resurrected until January 2001, nearly twelve years later after Byrd admittedly became aware of it. Thus, unlike the movant in *Hanserd*, Byrd *could have* raised his actual innocence claim in his first, pre-AEDPA federal habeas petition. *And Byrd actually knew this.* In an "Application for Stay of Proceedings to Allow Investigation and Discovery of Potential Claims and For Leave to Amend Petition to Comply With McClesky v. Zant*, 113 S.Ct. 1454 (1991)," filed on March 7, 1994, he stated:

> What [*McCleskey*] means to Petitioner Byrd is clear. He will have one chance to bring his habeas claims before the federal court. He and his counsel have the obligation to pursue all potential constitutional claims for which "reasonable investigation" may reveal previously unknown factual support.

For this reason, *Hanserd* and progeny are inapplicable. Furthermore, for the reasons we address next, pre-AEDPA law would not have entitled Byrd to raise the new habeas claims in any event. Thus, the application of pre-AEDPA law would not be "a difference that matters" entitling Byrd to pre-AEDPA standards under a *Landgraf* analysis.

### III.

### A.

Even if pre-AEDPA law applied to Byrd's case, Byrd's claim fails. First, and foremost, Byrd's case is the quintessential abuse of the writ -- as Byrd readily concedes, he deliberately withheld his actual innocence claim from his first federal habeas petition.

> Thus, for example, if a prisoner deliberately withholds one of two grounds for federal collateral relief at the time

---

presenting in a postconviction petition his claim of "actual innocence."
*Byrd*, 2001WL 950185, at *4 .

---

claimed that under *Bailey* he was serving time for conduct that was never a crime. *Hanserd*, 144 F.3d at 924.

Thus, the issue presented in *Hanserd* was "whether AEDPA's new restriction on filing multiple § 2255 motions 'is the type of provision that should govern cases arising before its enactment.'" *Id.* (quoting *Landgraf*, 511 U.S. at 280). Noting that Congress had not expressed any clear answer to the question, the *Hanserd* court looked to *Landgraf's* default rules to decide the issue. *Id.* This involved first determining whether the new legislation makes any changes to the controlling law, and second, whether, in light of any change, applying the relevant new law would attach new legal consequences to conduct predating the Act's passage such that applying it would have an impermissible retroactive effect. *Id.* at 924-25 (citing *Landgraf*).

The *Hanserd* court noted that under pre-AEDPA jurisprudence, a federal prisoner who wished to file a second or subsequent § 2255 motion was required to prove in the district court either that the motion did not constitute "abuse of the writ" or that he had made a "colorable showing of factual innocence," as required by *McCleskey*. *Id.* at 928. The court determined that Hanserd satisfied both of these criteria, because he could show both "cause" and "prejudice" for failing to raise the *Bailey* issue in the first motion. The court found that Hanserd had demonstrated cause for his failure to raise the issue in his first motion because at the time, this Court had supported a broad definition of "use" under the statute and had specifically rejected the claim in his direct appeal. *Id.* at 929. Hanserd also made a sufficient showing of both prejudice and actual innocence, because "it appear[ed] from the record that he pleaded guilty and was convicted for conduct that is, under *Bailey*, not criminal." *Id.* The *Hanserd* court therefore concluded that "under the old abuse-of-the-writ standard Hanserd would be entitled to raise his *Bailey* claim in a § 2255 motion." *Id.*

Next, the *Hanserd* court determined that the AEDPA standard would not allow such a § 2255 motion. The court noted that under the new law, a prisoner may file a second

§ 2255 motion only if the court of appeals rules that the motion contains newly discovered evidence or is based on a new rule of constitutional law. The *Hanserd* court observed that in the case *sub judice* there was no newly discovered evidence, and that *Bailey* merely decided the proper meaning of "use" under § 924(c) and did not announce a new rule of constitutional law. *Id.* at 929. Under the AEDPA standard, Hanserd's request to file the § 2255 motion would be denied. *Id.* Thus, applying the new statute would attach a severe new legal consequence to his filing a first motion; Hanserd would have lost the right to challenge his sentence. *Id.* at 931. The *Hanserd* court therefore held that Hanserd did not need permission to file a second motion to challenge his § 924(c) convictions under 28 U.S.C. § 2255 in the district court.

Relying on *Hanserd*, the movant in *Sonshine* argued that he should be allowed to file a second motion to vacate to raise ineffective assistance of trial and appellate counsel due to their failure to advise Sonshine or the district court that the court was required to impose his sentences on two counts concurrently with his undischarged prison term. Sonshine relied upon the following passage in *Hanserd*: "We therefore hold that a federal prisoner must satisfy the new requirements of 28 U.S.C.§ 2255 only if he has filed a previous § 2255 motion on or after April 24, 1996, the date AEDPA was signed into law. As Hanserd's previous § 2255 motion was filed before that date, he does not need to meet this new standard to file a second motion." *See Sonshine*, 132 F.3d at 1134 (quoting *Hanserd*, 123 F.3d at 934). Sonshine claimed that this language in *Hanserd* meant that he did not need to meet the new gatekeeping requirements of AEDPA because, like Hanserd, his first § 2255 motion was filed before April 24, 1996. He therefore reasoned that he does not need this court's authorization to file a second § 2255 motion at this time.

The *Sonshine* court rejected this reading of *Hanserd*:

Taken out of context in this way, the quoted portion of the *Hanserd* decision would seem at first glance to support Sonshine's position. *See also Hanserd*, 123 F.3d

result in the incarceration of innocent persons."); *Sawyer*, 505 U.S. 333, 339-40 (1992) ("We have previously held that even if a state prisoner cannot meet the cause and prejudice standard, a federal court may hear the merits of the successive claims if the failure to hear the claims would constitute a "miscarriage of justice." In a trio of 1986 decisions [*Kuhlmann v. Wilson*, 477 U.S. 436 (1986), *Murray v. Carrier*, 477 U.S. 478 (1986); and *Smith v. Murray*, 477 U.S. 527, 537 (1986)] we elaborated on the miscarriage of justice, or "actual innocence," exception. As we explained in *Kuhlmann,* the exception developed from the language of the federal habeas statute, which prior to 1966, allowed successive claims to be denied without a hearing if the judge were "satisfied that the ends of justice will not be served by such inquiry.")

In short, Byrd was on notice, as early as the filing of his first federal habeas petition in 1994, that his actual innocence claim, which he had admittedly known about since 1989, could have been raised and would have excused the procedural default of failing to raise it in the state courts. Instead, Byrd's actual innocence claim lay dormant through the filing and appeal of his first federal habeas petition and denial of certiorari, not to mention both the state appellate process and postconviction proceedings[6], and was not

---

[6] Byrd also could have brought a successive postconviction petition in the Ohio courts. *See* Ohio Rev. Code § 2953.23(A) [pre-1995 version of the statute] (providing that "the court may, in its discretion and for good cause shown, entertain a second petition or successive petition for similar relief on behalf of the petitioner based upon the same facts *or newly discovered evidence.* (Emphasis added.) Furthermore, under the prior version of the statute, a postconviction petition could be filed "at any time." Ohio Rev. Code § 2953.21. *See also State v. Byrd*, No. C-010379, – N.E.2d – , 2001 WL 950185 (Ohio Ct. App. Aug. 21, 2001) (per curiam).

As the Ohio Court of Appeals noted in its denial of Byrd's appeal of the state trial court's denial of his successive postconviction petition,

[Byrd's] attorneys acknowledge that, since 1989, they have been in possession of an affidavit from co-defendant John Brewer stating that he, and not Byrd, fatally stabbed Tewksbury. Thus, Byrd cannot show that he was "unavoidably" prevented from

The *Hanserd* exception, as clarified by *Sonshine* and *Green*, does not apply here. *Sonshine* makes clear that the AEDPA gatekeeping provisions of § 2244(b)(2) cannot be avoided simply because the initial habeas petition was filed pre-AEDPA. Furthermore, it is apparent from *Hanserd*, *Sonshine*, and *Green* that the exception applies where the petitioner was *unable because of the then-current state of the law* to raise a claim in his first federal petition. In *Hanserd*, the movant's request was based on an intervening Supreme Court decision that gave the movant an argument that he could not have previously raised in his initial habeas petition. Thus, the movant in *Hanserd* had cause to excuse his abuse of the writ. He also obviously established prejudice, since the *Bailey* decision made it clear that Hanserd had been convicted for innocent behavior. The movants in *Sonshine* and *Green* could not establish cause because the new claims they sought to raise were not new or novel.

Unlike the prisoner in *Hanserd*, Byrd was on notice, certainly as early as his first federal habeas petition, that he could avail himself of the actual innocence/fundamental miscarriage of justice exception to excuse any procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *accord Sawyer v. Whitley*, 505 U.S. 333, 339 (1992); *Dugger v. Adams*, 489 U.S. 401, 411 n.6 (1989); *Smith v. Murray*, 477 U.S. 527, 537-38 (1986); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Engle v. Isaac*, 456 U.S. 107, 135 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 91 (1977); *see also McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Furthermore, Byrd also had to have known that actual innocence/miscarriage of justice" exception extends to abuse of the writ. *See Herrara v. Collins*, 506 U.S. 390, 404 (1993) ("In a series of cases culminating with *Sawyer v. Whitley*, 505 U.S. 333 . . . (1992), decided last Term, we have held that a petitioner otherwise subject to defenses of abusive or successive use of the writ may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence. This rule, or fundamental miscarriage of justice exception, is grounded in the "equitable discretion" of habeas courts to see that federal constitutional errors do not

at 933 ("Our holding means that federal inmates will have one post-AEDPA bite at the apple, limited further, for prisoners who filed a § 2255 motion before AEDPA's enactment, by the old abuse-of-the-writ standard."). Sonshine is now requesting his "one-post AEDPA bite at the apple." However, when read in the context of the entire decision, it is clear that his case is not supported by *Hanserd*.

The specific problem we addressed in *Hanserd* was whether a legitimate claim brought pursuant to *Bailey v. United States*, 516 U.S. 137, . . . (1995), could be brought before the federal courts when the movant had already presented a pre-AEDPA, pre-*Bailey* motion to vacate under § 2255, and would thus be barred from bringing another § 2255 motion by the gatekeeping requirements set up by Congress in AEDPA. While *Bailey* itself was merely a decision of statutory interpretation--making it ineligible to support a second § 2255 motion under AEDPA--it raised concerns of constitutional dimension as numerous inmates were serving mandatory prison time for offense of which they were actually innocent. *See Triestman v. United States*, 124 F.3d 371-72, 379 (2d Cir. 1997); *Hanserd*, 123 F.3d at 929.

We, therefore, analyzed the effect that AEDPA had on a claim, such as that raised by Hanserd, which would have survived the old "abuse-of-the-writ" test, *see McCleskey v. Zant*, 499 U.S. 467, 494-95, . . . (1991), under the Supreme Court's decision in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 . . . . We concluded that AEDPA does not apply to a movant seeking to raise a *Bailey* claim after having filed a pre-AEDPA motion to vacate because applying AEDPA would have a retroactive effect on the movant's pre-AEDPA conduct, i.e., he would be barred from filing a second motion to vacate under AEDPA whereas, before the Act, he would have been permitted to file his second motion.

*Because the Hanserd court's Landgraf analysis was based upon the retroactive effect that AEDPA had on the*

*movant's particular claim, the Hanserd holding must be similarly circumscribed.  Consequently, while Hanserd is not strictly limited to claims arising under Bailey, apart from that class of claims, there will be few other cases "in which the difference matters," Hanserd, 123 F.3d at 934 n.21, and on which the gatekeeping requirements of AEDPA will thus have an impermissibly retroactive effect.*

*Id.* at 1134-35 (emphasis added).  The *Sonshine* court concluded Sonshine was not entitled to relief, because the issue he sought to raise was basically one arising under the Sentencing Guidelines, which would be barred under both AEDPA and the abuse-of-the-writ standard.  *Id.*  The court further noted that Sonshine would not have prevailed under the pre-AEDPA law, because his petition would have been denied as an abuse of the writ.  *Id.*  Thus, the AEDPA's new restrictions did not attach new legal consequences for Sonshine, and the AEDPA had no "impermissibly retroactive effect" on the case.  *Id.*

Thus, in *Sonshine*, this Court carefully limited *Hanserd*.  The *Sonshine* court stated that the retroactivity determination in *Hanserd* was based on the particular facts presented, and while *Hanserd* is not strictly limited to claims arising under *Bailey*, "apart from that class of claims," few cases will qualify as those "in which the difference matters" and the AEDPA will have an impermissibly retroactive effect.

In *Green*, we refused to apply *Hanserd* where it was clear from the record that the prisoner could not have justified a second action under the pre-AEDPA cause and prejudice standard.  The movant in *Green* had been convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  Green filed his first motion to vacate under § 2255 on June 25, 1992, which was subsequently denied as without merit.  He filed a second § 2255 motion on August 3, 1995, which the district court denied as an abuse of the writ.  In his third motion, Green argued that there had been a substantive change in the law based on *Old Chief v. United States*, 519 U.S. 172 (1997).  *Old Chief* held that a district court abused

its discretion for admitting evidence of a prior conviction for the sole purpose of supporting a 18 U.S.C. § 922(g) conviction, after the defendant offered to stipulate to the existence of the prior conviction.  *See Green*, 144 F.3d at 385.  The *Green* court held that the decision in *Old Chief* announced a "new rule"of criminal procedure, and was subject to the rule of *Teague v. Lane*, 489 U.S. 288 (1989) (holding that if a decision announces a "new rule" of criminal procedure, it is not to be applied retroactively to convictions that have already become final when the decision is announced, subject to certain exceptions).  As such, it was not retroactive and was therefore inapplicable on collateral review.  *Id.*

More importantly, the *Green* court held that regardless of whether *Old Chief* announced a new rule, the gatekeeping provisions of § 2244 applied to Green's case because Green would not have been able to establish cause to excuse his failure to assert this claim in his first pre-AEDPA § 2255 motion to vacate.  The court reasoned:  "If *Old Chief* was dictated by precedent, then his claim would not have been considered 'novel,' so as to establish cause his failure to assert this claim in his first motion to vacate."  *Id.* at 387.  The *Green* court concluded:

Thus, even if *Old Chief* did not announce a new rule, applying AEDPA to this case would not have a retroactive effect on pre-AEDPA conduct.  Green would have been barred from asserting this claim in a pre-AEDPA motion to vacate under the abuse of the writ doctrine, as he would not have been able to establish cause to excuse his failure to present this claim in his first motion to vacate, nor could he have otherwise made a colorable showing of factual innocence.  *See McCleskey v. Zant*, 499 U.S. 467, 495 . . . (1991); *In re Hanserd*, 23 F.3d at 928-29.

*Id.* at 387-88.  The gatekeeping provisions in § 2244 therefore applied to Green's case.  *Id.* at 388.